**David DIAZ, Appellant,**

v.

**Juanita O. CANTU, Appellee.**

**No. 1376.**

Court of Civil Appeals of Texas, Corpus Christi.

May 31, 1979.

Rehearing Denied June 15, 1979.

Irma Rangel, Garcia & Rangel, Kingsville, for appellant.

Leo Villarreal, Glusing, Sharpe, Villarreal & Williams, Kingsville, for appellee.

## OPINION

BISSETT, Justice.

This is a suit for conversion. Juanita O. Cantu sued David Diaz and his wife for damages as a result of alleged conversions of: 1) $2,000.00 cash from a safety deposit box; 2) a certificate of deposit in the amount of $2,373.59; and 3) the proceeds of the payment of $4,012.70 on an insurance claim. Trial was before a jury. Judgment was signed on February 10, 1978, wherein the plaintiff, Juanita O. Cantu recovered of David Diaz, $4,012.70 as actual damages for conversion of the aforesaid insurance proceeds and $10,000.00 as exemplary damages. It was further decreed that the plaintiff take nothing in her suit against Mrs. Diaz. David Diaz has duly perfected an appeal from the judgment.

Diaz, in his answer to Cantu's petition, in addition to other defenses, denied that he took the $2,000.00 in cash. He further alleged, by way of affirmative defense, that the aforesaid sums of $2,373.59 and $4,012.70 were given to him by Cantu in gratitude and appreciation for aid, assistance and the many kindnesses which he had extended to her in days gone by.

Diaz first contends that there is no evidence to support the answers to Special

Issues 3 and 13, wherein the jury found that Diaz "converted to his own use the proceeds received by Juanita Cantu from the insurance company" (No. 3); and that Cantu did not make a gift of such proceeds "to the members of the Diaz family individually or collectively" (No. 13). In the alternative, it is claimed that the evidence is factually insufficient to support such answers.

In disposing of the "no evidence" and "factually insufficient evidence" points, we consider all of the evidence and adhere to the well-established rules set forth in *Garza v. Alviar*, 395 S.W.2d 821 (Tex.Sup. 1965) and *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Cantu became disabled in 1969. She was 56 or 57 years of age at that time. As a result of such disability, she was awarded $1,704.00 by the Social Security Administration. Her disability forced her to quit her regular job because it required her to be on her feet for long and uninterrupted periods of time. However, she did perform odd jobs subsequent to her disability until late summer of 1975. These jobs consisted in the main of yard work such as mowing laws, edging borders, trimming shrubbery, and the like. Between July 13, 1975, and September 13, 1975, one of her legs was amputated. At that time she was the insured under a hospitalization and medical insurance policy. On January 2, 1976, a check in the amount of $4,012.70, payable to her order, was delivered to Diaz by a duly authorized representative of the insurance company. This check represented a complete settlement with the company for Cantu's loss of her leg. Diaz delivered the check to Cantu, who endorsed it; Diaz deposited the proceeds thereof "in a certificate of savings in the State Bank of Kingsville."

It is undisputed that Diaz subsequently used the proceeds from the insurance company's check to purchase property in his own name for his own exclusive use and benefit. According to Diaz, Cantu, when she endorsed the insurance company check, told him:

"It is your check, you keep it. Do whatever you want to do."

Diaz contends that the allegation of conversion of the insurance proceeds is refuted, and his defense of "gift" is established, by his own testimony and the testimony of witnesses called by him, who testified substantially, as follows: he and Cantu had been friends for many years; Cantu referred to Diaz and his family as "her folks"; prior to the hospitalization which resulted in the amputation of Cantu's leg, Diaz, or members of his family, took Cantu to Galveston for medical examinations on several occasions; Cantu went to live permanently in the home of Diaz in March, 1975, where she remained until November, 1976; during the aforesaid period of time, Diaz and members of his family took care of her by cooking for her, laundering her clothes, running errands for her and furnishing her with living quarters, all without cost or expense to her. Diaz also testified that he paid premium payments on her insurance policy; he furnished her with free gasoline, oil and repairs to her motor vehicle from March, 1975, to November, 1976, when she lived in the house furnished by him.

It is undisputed that Cantu was completely self-supporting from the time she was disabled in 1969, until March, 1975, when she moved to a rent house owned by Diaz. The evidence introduced by Cantu sharply conflicted with the evidence adduced by Diaz concerning her support from March, 1975, to November, 1976. Cantu testified that her reason for moving was because there would be neighbors (the Diaz family) close by who could assist her in the event she got sick. She further testified that Diaz never supported her and that she, in effect, supported herself during the time that she lived in the rent house owned by Diaz, as a result of monies paid by her to the Diaz family and monies provided by the Welfare Department for her support. It is undisputed that in March, 1975, one Frank Rios owed Cantu the sum of $3,206.66. He was paying her $65.00 per month on said debt. From March, 1975, to November,

1976, this monthly payment of $65.00, pursuant to Cantu's instructions, was made by Rios directly to Diaz. It is further undisputed that Cantu paid Mrs. Diaz $100.00 in cash on October 3, 1975, which, according to Cantu was compensation for her meals and upkeep to date. She also paid Mrs. Diaz $60.00 in cash per month thereafter until May, 1976, when the Welfare Department commenced paying Mrs. Diaz for Cantu's care. These payments consisted of a May payment of $130.00 and payments of $127.00 each for the months of June, July, August, September and October, 1976. In addition, food stamps in the amount of $50.00 per month for the months of June, July, August, September and October, 1976, were made available to Cantu, but they were used by Mrs. Diaz in the purchase of food. There is no evidence that the food purchased with the stamps was consumed exclusively by Cantu, and the only inference that can logically be drawn from the evidence is that such food went into the larder of the Diaz family and that it was consumed by the members of the family along with Cantu.

On the issue of "gift," Cantu denied that she gave the insurance proceeds to Diaz. She said that she told Diaz to put the check in "savings." Apparently at that time she did have a savings account. Her position on the question of "gift" was stated by her, as follows:

"This is not a gift. This money was put up in those savings for this situation that I was suspecting. I was getting older everyday. And the situation was going to be that I didn't have nobody to take care of me. And this money was put with the intention—whenever I laid down and nobody can take care of me, I won't have to pay somebody to wait on me. And I would have this money in savings. Otherwise, if I didn't want to safe (sic) this money for this situation, I could have got it out of there and bought me a house and got it out of there and buy anything I wanted. And this money was put there for the purpose of I was getting older and getting sick."

Concerning the alleged conversion of the proceeds from the insurance company check, Cantu testified: on September 24, 1976, she requested that Diaz take her to see a doctor in Corpus Christi, Texas; Diaz refused for the reason: "the County will not permit me anymore to take anybody anywhere else"; Cantu then asked "how am I going to go to the doctor in Corpus?"; Diaz replied: "Call the Community Action"; whereupon, Cantu said: "I want some money"; Diaz told her: "I don't have any money." Thereafter, Cantu called Community Action, which transported her from Kingsville to the doctor's office in Corpus Christi, and following a period of hospitalization and treatment took her back to Kingsville on October 27, 1976. Cantu packed her belongings and left the Diaz premises on November 2, 1976. She did not return thereafter. On April 4, 1977, an attorney representing Cantu, wrote Diaz and demanded that payment be made immediately of the $2,000.00 cash in the safety deposit box, the certificate of deposit and the insurance proceeds. Diaz did not make any payment. This suit was then filed on April 23, 1977.

Mrs. Diaz, in answer to the question: "When was the first time that you understood that Miss Cantu was demanding her money back?";

responded:

"it must have been the first notice my husband got."

Diaz, who acknowledged that he knew that Cantu wanted her money back, was somewhat confused as to the date he first learned of that fact. He did, however, admit that he was so advised by her attorney "in January of '76 or '77."

For the most part, the only testimony of probative value concerning the alleged "conversion" and the defensive allegation of "gift" is found in the testimony of Diaz, his wife, and Cantu. The testimony of other witnesses sheds little light on the issues.

■■ The testimony of a party to a suit raises an issue of fact. *Bishop v. Bishop*, 359 S.W.2d 869 (Tex.Sup.1962). It is within the province of a trier of fact, the jury in

the instant case, to judge the credibility of a witness and the weight to be given testimony by the witness. *Austin Fire Ins. Co. v. Adams-Childers Co.*, 246 S.W. 365 (Tex. Com.App.1923, opinion adopted).

■ A court of civil appeals cannot substitute its judgment for that of a trier of fact, even though after reviewing the evidence it may have reached a different conclusion from that of the jury, or judge, as the case may be. *Johnson v. Buck*, 540 S.W.2d 393 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.); *Bardwell v. Anderson*, 325 S.W.2d 929 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.). Nor may a court of civil appeals pass upon the credibility of witnesses. *Burchfield v. Tanner*, 142 Tex. 404, 178 S.W.2d 681 (1944).

In the instant case the credibility of the parties and their witnesses, the weight to be given their testimony, the nature of the relationship between the parties, and the grounds for assertions of bias and prejudice on the part of the witnesses called to testify for the parties were very pointedly brought to the attention of the jury by counsel for each of the parties. The many conflicts, disputes and contradictions presented by the evidence were resolved by the jury, the trier of fact. The jury found in favor of Diaz with respect to the alleged conversion of $2,000.00 cash when it believed Diaz who testified that he never saw any cash in the safety deposit box. The jury further believed Diaz when he testified that Cantu gave him the certificate of deposit. The jury, however, did not believe Diaz and his witnesses with respect to the dispute between the parties as to whether or not Cantu made a gift to him of the insurance proceeds. That dispute was resolved in favor of Cantu.

■ The burden of proof of a gift inter vivos is on the party claiming that the gift was made. *Garrett v. Hunt*, 283 S.W. 489 (Tex.Com.App.1926, opinion adopted); *Forbes v. Forbes*, 430 S.W.2d 947 (Tex.Civ. App.—Amarillo 1968, no writ). Diaz did not meet that burden.

■ We hold that there is ample evidence to support the findings by the jury: 1) that Cantu did not make a gift of the insurance proceeds to Diaz; and 2) that Diaz converted the proceeds paid by the insurance company to Cantu for his own use. The "no evidence" and "factually insufficient evidence" points relating to "conversion" and "gift" cannot be sustained.

■ Diaz further contends that the trial court erred in failing to submit a proper definition of "gift" in connection with the submission of Special Issue 13. We do not agree.

Special Issue 13 inquired into whether Cantu made a gift of the insurance proceeds to Diaz. The jury found: "She did not make a gift." The trial court submitted the following instruction:

"In answering Special Issue No. 13, you are instructed that for there to have been a gift of the proceeds of the insurance policy in question, there must have been a delivery of possession of such proceeds by Juanita O. Cantu to a member of the Diaz family together with the intention of Juanita O. Cantu at that time to relinquish all of the rights, title, and interest in such proceeds unconditionally and vesting the same in the members of the Diaz family individually or collectively."

We hold that the definition of "gift" as contained in the aforesaid instruction was proper. *Forbes v. Forbes*, supra; 27 Tex. Jur.2d, Gifts, §§ 6, 8. The definition is not "a comment on the weight of the evidence," as argued by Diaz.

■ It is also asserted that the trial court erred in connection with the submission of Special Issue 4, in failing to submit a proper definition of the terms "maliciously," "wantonly," "fraudulently," and "unlawfully" for "the purpose of establishing whether or not Appellant committed any act in such a fashion."

Special Issue 4, which was to be answered only if the jury found that Diaz did convert the insurance proceeds to his own use, reads:

"Do you find from a preponderance of the evidence that in so converting David Diaz acted intentionally, willfully, and in conscious disregard of the rights of Juanita Cantu?"

The jury answered:

"He did."

The contention has no merit. The language used by the trial court in the submission of Special Issue 4 was proper. The failure to define the terms "maliciously," "wantonly," "fraudulently," and "unlawfully" did not constitute reversible error.

■ Diaz also claims that the trial court erred in failing to submit special issues on "demand" and "refusal." We disagree. The record conclusively shows that a demand was made by the attorney for Cantu that Diaz return the insurance proceeds. Diaz, while he did not remember the exact date he received the "demand" nevertheless knew that Cantu was demanding that he return the insurance proceeds to her. It is undisputed that he did not return or repay any of the proceeds. Thus, there was no need to submit issues on "demand" and "refusal.".

■ Diaz does not, by a point of error, complain that the award of $10,000.00 is excessive; he does not ask for a remittitur. Diaz complains that there is no evidence, or, in the alternative, that the evidence is factually insufficient to support the award. The prayer for relief in his brief filed in this Court, in pertinent part, asks "that this cause be reversed and rendered in favor of Appellant and for such other relief as may appear proper." He does not ask for a reversal and remand. The question of excessiveness as to the award of $10,000.00 is not before us in this appeal.

Having found that Diaz did convert the insurance proceeds to his own use, the jury properly considered and answered Special Issue 15, the exemplary or punitive damage issue. The jury was instructed:

"In connection with the foregoing special issue, you are instructed that 'Punitive Damages' are damages allowed, not as compensation, but as punishment by reason of wrongdoing for an act or acts done intentionally, willfully, and in conscious disregard of the rights of another and as an example for the good of the public to deter or discourage similar acts in the future by others. Punitive damages may be assessed by (sic) a jury, in its discretion, finds from a preponderance of the evidence that such punitive damages should be assessed."

■ An analysis of the record in its entirety shows that there was ample evidence to support an award of money as punitive damages in this case. The award of $10,000.00 is fully warranted by the evidence. For authorities dealing with the assessment of money as punitive damages where there has been an intentional, willful and conscious disregard for the rights of others, see *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444 (Tex.Sup.1971); *Ware v. Paxton,* 359 S.W.2d 897 (Tex.Sup.1962); *Masso v. Bryan,* 498 S.W.2d 19 (Tex.Civ. App.—Austin 1973, writ ref'd n. r. e.); *LeMieux Lumber Co., Inc. v. Newman,* 437 S.W.2d 356 (Tex.Civ.App.—Beaumont 1969, writ ref'd n. r. e.); *Louisiana Pacific Corp. v. Smith,* 553 S.W.2d 771 (Tex.Civ.App.— Tyler 1977, no writ).

We have carefully considered all of the evidence adduced at the trial and all of the points of error which have been brought forward in this appeal. All points are overruled.

AFFIRMED.

NYE, C. J., not participating.