**FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant,**

v.

**F & A EQUIPMENT LEASING, a Partnership, and Kenneth W. Arterbury and Danny Frazell, Individually; Bobby R. Wilson; and Vernon F. Wilson, Appellees.**

No. 05–89–00487–CV.

Court of Appeals of Texas, Dallas.

March 30, 1993.

Rehearing Denied June 1, 1993.

J. Roderick Price, Midland, Bill W. Bailey, DeSoto, for appellant.

Gary Kessler, Howard C. Rubin, Dallas, for appellees.

Before BAKER,[1] ROSENBERG and MORRIS[2], JJ.

## OPINION ON MOTION FOR REHEARING ON REMAND

ROSENBERG, Justice.

The motions for rehearing filed by Federal Deposit Insurance Corporation and F & A Equipment Leasing are overruled. We withdraw the opinion and vacate the judg-

---

**1.** The Honorable James A. Baker, Justice, replaces Chief Justice Craig Enoch, a member of the original panel. Justice Baker has reviewed the briefs and record in this case.

**2.** The Honorable Joseph B. Morris, Justice, succeeds Justice Kevin B. Wiggins, a member of the original panel. Justice Morris has reviewed the briefs and record in this case.

ment of November 23, 1992. This is now the opinion of this Court.

The Federal Deposit Insurance Corporation (FDIC), in its corporate capacity and as successor in interest to First Consolidated Bank–Pleasant Run, N.A. (FCB), appealed from a judgment rendered against FCB in favor of F & A Equipment Leasing, Kenneth W. Arterbury, Danny Frazell,[3] Bobby R. Wilson and Vernon F. Wilson (the Wilsons), in a suit on three promissory notes. Upon original submission to this Court, FCB brought eight points of error. FDIC became a party after appeal, adopted FCB's brief, and brought four additional points, claiming federal defenses under a provision in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. In our original opinion of July 1, 1992, we held FDIC was entitled to assert those federal defenses and reversed and rendered in favor of FDIC. We also vacated that part of the judgment denying the note-holder's right to collect on the promissory notes and remanded that issue for further consideration.[4] The Supreme Court of Texas determined that FDIC could not raise those federal defenses for the first time on appeal and reversed and remanded this cause to this Court for further consideration. We reverse in part and affirm in part.

The facts have been previously set out in our original opinion. We shall only repeat them here to the extent necessary to dispose of the issues.

▬ In its fifth point of error, FDIC asserts that the trial court erred in completely discharging F & A from liability on the notes based on F & A's defense of collateral impairment. *See* TEX.BUS. & COM. CODE ANN. § 3.606(a)(2) (Vernon 1968). FDIC claims that defense is available only to parties who are in a position of surety with respect to a promissory note and that the defense is not available to the maker of a note. F & A were the original makers of the note. FDIC contends that they re-

mained comakers even after the Wilsons signed the notes. FDIC concedes that, as comakers, F & A may be entitled to discharge to the extent of their right of recourse against the Wilsons. However, FDIC argues that because no determination was made regarding the extent F & A can be discharged from liability for the notes as comakers, F & A have not shown entitlement to discharge. FDIC relies on *Crimmins v. Lowry,* 691 S.W.2d 582 (Tex. 1985), for this argument. F & A argue that the evidence supports a finding that they were merely sureties for the Wilsons on the notes after the Wilsons signed the notes. No fact issue on F & A's suretyship status was submitted to the jury. From the trial court's finding that, as a matter of law, F & A could prevail on the defense of collateral impairment, it is apparent that the trial court impliedly found that F & A were sureties on the notes.

▬ The trial court's determination that F & A could prevail on the defense of collateral impairment is a conclusion of law, while the finding that F & A were sureties is a finding of fact that supports that legal conclusion. When reviewing the trial court's findings of fact and conclusions of law, the fact findings are of the same force and dignity as a jury's verdict on special issues. *MJR Corp. v. B & B Vending Co.,* 760 S.W.2d 4, 10 (Tex.App.—Dallas 1988, writ denied); *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). It is within the sole province of the trier of fact to judge the credibility of the witnesses and the weight to be given their testimony. *Clancey v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

▬ An appellate court may not substitute its judgment for that of the trier of fact, even though, after reviewing the evidence, it may have reached a different conclusion from that of the trier of fact in the

---

**3.** All of the appellees, except for Bobby and Vernon Wilson, will be collectively referred to as "F & A" unless otherwise indicated.

**4.** *See Federal Deposit Ins. Corp. v. F & A Equip. Leasing,* 800 S.W.2d 231 (Tex.App.—Dallas 1990), *rev'd per curiam,* 835 S.W.2d 74 (Tex. 1992).

case. *Essex Crane Rental Corp. v. Striland Constr. Co.*, 753 S.W.2d 751, 755–56 (Tex.App.—Dallas 1988, writ denied); *Diaz v. Cantu*, 586 S.W.2d 576, 580 (Tex.Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.). Conversely, an appellate court is not bound by the trial court's conclusions of law. *LaChance v. Hollenbeck*, 695 S.W.2d 618, 622 (Tex.App.—Austin, 1985, writ ref'd n.r.e.); *Harry Hines Medical Ctr., Ltd. v. Wilson*, 656 S.W.2d 598, 603 (Tex.App.—Dallas 1983, no writ). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Simpson v. Simpson*, 727 S.W.2d 662, 664 (Tex.App.—Dallas 1987, no writ). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards as are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a special issue. *Baker v. Baker*, 719 S.W.2d 672, 674–75 (Tex.App.—Fort Worth 1986, no writ). In addressing a legal sufficiency or no evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, that support the finding, and we must disregard all evidence and inferences to the contrary. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Stafford*, 726 S.W.2d at 16. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex.1970); *see also* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX.L.REV. 361 (1960). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, there is some evidence or, in other words, more than a scintilla of evidence. *Kindred*, 650 S.W.2d at 63.

A no evidence point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Baker*, 719 S.W.2d at 675. When we sustain a no evidence point, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. TEX.R.APP.P. 80(b) & 81(c); *Baker*, 719 S.W.2d at 675.

In addressing a factual sufficiency of the evidence challenge, an appellate court must consider and weigh *all* of the evidence, not just that evidence which supports the verdict. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). Keeping these standards of review in mind, we consider the law of suretyship.

A surety is a party who promises to answer for the debt of another. *Crimmins*, 691 S.W.2d at 585. A surety is also known as an accommodation party. *Caldwell v. Stevenson*, 567 S.W.2d 278, 280 (Tex.Civ.App.—Austin 1978, no writ). The Texas Business and Commerce Code provides:

(a) The holder discharges any party to the instrument to the extent that without such party's consent the holder

\* \* \* \* \* \*

(2) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

TEX.BUS. & COM.CODE ANN. § 3.606(a)(2) (Vernon 1968). This provision states a defense available to all parties in the position of a surety. *Crimmins*, 691 S.W.2d at 584.

One "in the position of a surety" is a party who has a right of recourse or a right of subrogation. *Id.* at 585. Because a comaker has a potential right of recourse against his fellow comakers, a comaker can claim the suretyship defenses under section 3.606. *Id.* A comaker, however, will be discharged only to the extent of his right of recourse against the other comakers, while a surety that is not a comaker will be completely discharged pursuant to section 3.606. *Id.*

■ F & A had the burden of proving their status as sureties or proving what part of the debt on the notes represents their liability as comakers. *Crimmins,* 691 S.W.2d at 585; *Caldwell,* 567 S.W.2d at 280. One presumptively signs as a comaker unless the suretyship relationship between the cosigners appears on the face of the note. *Caldwell,* 567 S.W.2d at 280. No suretyship relationship appears on the notes at issue here. The name F & A Equipment Leasing is typed on the note. Arterbury and Frazell each signed twice, once in the capacity of partner of F & A Equipment Leasing and once in their individual capacities. Vernon Wilson and Bobby Wilson also signed. There is no indication that some parties signed on a different date or that F & A changed positions from principal obligors to sureties.

■ Because the suretyship relationship is not clear from the face of the notes, it was incumbent upon F & A to rebut the presumption that they remained comakers. *Id.* The relation of principal and surety is the result of an express agreement between the parties, or a contract that may be fairly implied from the situation. *Durham v. McDowell,* 265 S.W. 425, 426 (Tex.Civ.App.—El Paso 1924, no writ). Parol evidence is admissible to prove such an agreement. *Id.* The intention of the parties is a significant element in determining whether a party is an accommodation maker. *Dalton v. George B. Hatley Co.,* 634 S.W.2d 374, 378 (Tex. App.—Austin 1982, no writ). Another factor to consider in making that determination is whether the party claiming to be a surety received a direct benefit from the

execution of the instrument. If he received no direct benefit, he is likely to be regarded as an accommodation party. *Id.* Further, the party claiming suretyship status must prove that he signed the instrument for the sole purpose of helping another signatory obtain credit under an agreement that the accommodated party is principally responsible or that the instrument was executed for a limited purpose. *Bixenstine v. Palacios,* 805 S.W.2d 889, 892 (Tex.App.—Corpus Christi 1991, no writ). Additionally, one claiming to be a surety must prove that the payee knew of his relation as surety where it is not apparent from the face of the note. *Stetson v. First Nat'l Bank,* 44 S.W.2d 792, 794 (Tex.Civ.App.—Beaumont 1932, writ ref'd).

■ Even more proof is required where, as here, one who signed as an original maker claims that, due to an assumption of the note, his position has changed to that of surety. Where the original maker enters into an agreement with another whereby the second party is to assume the note, as between them, the assumptor becomes primarily liable and the original maker becomes a surety. *Dansby v. Stroud,* 48 S.W.2d 1018, 1020 (Tex.Civ. App.—Waco 1932, writ ref'd). However, the original maker and the assumptor cannot by agreement between themselves change the character of the original maker's liability to the payee from principal to surety. *Fitzgerald v. Browning–Ferris Mach. Co.,* 49 S.W.2d 489, 493 (Tex.Civ. App.—Waco 1932, writ dism'd). The one claiming to be a surety must prove that the payee has accepted the assumption and consented to the change in order for the assumptor to become primarily liable as to the payee and the original maker to become liable as surety as to the payee. *Wilson v. J.W. Crowdus Drug Co.,* 222 S.W. 223, 224 (Tex. Comm'n App.1920, judgm't adopted); *Dansby,* 48 S.W.2d at 1020. Mere acceptance of the assumption by the payee is not enough. There must be a corresponding release of the original debtor by the payee, demonstrating consent to the changed character of his liability, or some action taken by the payee recognizing the assumptor as the primary debtor. *Wilson,*

222 S.W. at 225; *La–Rey, Inc. v. Kowalski,* 433 S.W.2d 530, 533 (Tex.Civ.App.—San Antonio 1968, no writ).

F & A claim that the parties intended for the Wilsons alone to be principally liable and for F & A to be liable only as sureties. They assert that intent was evidenced in Frazell's testimony by the following: (1) Frazell believed he and Arterbury were only sureties; and (2) FCB's representative told F & A that when the Wilsons added their signatures to F & A's on the original documents, the effect would be the same as F & A signing as sureties for the Wilsons. They also assert that intent was evidenced in FCB's representatives' testimony by the following: (a) FCB did not try to recover from F & A until after the Wilsons defaulted; (b) FCB agreed to return the collateral to F & A after the Wilsons defaulted; and (c) the Wilsons received the full benefit of the collateral.

There is no written suretyship agreement between F & A and the Wilsons. Frazell testified that F & A received no money from the Wilsons, but the Wilsons assumed the notes and took over payments. Frazell stated that the only agreement F & A had with the Wilsons was an agreement that the Wilsons would buy the tractors. Frazell also testified that it was Don Beers, a loan officer at FCB, who told him that the Wilsons wanted to assume the notes. Frazell expected FCB to draw up a new note for the Wilsons and, after Beers told him FCB wanted F & A to "stay on the note," he expected they would be sureties on a new note. On June 12, 1986, the Wilsons, Frazell, and Arterbury met with Beers. Frazell testified as to what occurred at that meeting:

> [Beers] handed the Wilson brothers the notes that Ken and I had signed more than a year earlier on this transaction when we originally financed the tractors and asked them to sign our note. I said, Don, wait a minute. My understanding is that—of the deal—is that there is going to be new notes and the Wilsons are going to sign new notes as the obligators [sic] and Ken and I will be signing as a co-signer or surety. And he said, don't worry about it, Danny, this is the same thing. This is just the way the bank wants it done. So, I didn't argue with him about that.

Frazell stated that he interpreted the phrase "the same thing" to mean their actions constituted the same thing as drawing up and signing a new note. Frazell further testified that he saw himself and Arterbury as sureties, that they "would be in a position, if the Wilsons didn't service the debt on the tractors, that the bank would look to [him and Arterbury] to do that." Frazell testified on the issue of their release from liability on the notes:

> [I]t has been my experience over the last ten years that anytime that the bank had somebody on a note, they didn't release them on that note. They left them there until that note was satisfied. So, I fully expected, when Mr. Beers told me that these guys wanted to assume our note, that's probably the position that we were going to be left in, also.

F & A's payment books were given to the Wilsons at the meeting and Beers gave Frazell and Arterbury permission to turn the tractors over to the Wilsons.

Arterbury also testified that he understood that they were to stay on the notes as sureties. Arterbury and Frazell both stated that they had an agreement with Beers that if the Wilsons did not pay the notes, Beers would return the equipment to F & A. They also both explained that, after the Wilsons stopped paying on the notes, they made several attempts to locate and retrieve the equipment. Bobby Wilson stated in his deposition that, as he understood it, the Wilsons assumed the notes.

According to Beers, the parties initially approached him about a sale of the equipment to the Wilsons. After a credit check revealed that the Wilsons were a poor credit risk, the bank turned down the Wilsons' application for a new loan. Beers stated that he explained that to Frazell. The bank would allow the Wilsons to assume the notes or have a lease-purchase agreement if F & A remained on the notes along with the addition of the Wilsons. Beers explained that just the use of the collateral

was to be transferred. He did not have the Wilsons sign a UCC–1 financing statement[5] because they were not transferring the loan; it was still in F & A's name and it was still their responsibility, along with the Wilsons. Beers acknowledged that he had an agreement with F & A that, if the Wilsons did not pay, the equipment would be returned to F & A.

Vic Roper, Chairman of the Board and Chief Executive Officer of the bank, stated that the Wilsons were rejected as credit customers. He claimed the bank never made a loan to them. The Wilsons merely added their signatures to a note that had been executed months earlier. He said there was not a new loan and no change of ownership occurred. Roper stated that the bank included the Wilsons in the suit as comakers, but F & A are the primary makers of the note. He stated that the bank's pleading alleged that the Wilsons assumed the *payment* of the notes, but that the bank did not approve an assumption of the notes by the Wilsons. The bank continued to look to F & A as primary makers. He explained that where a sale of merchandise and assumption of the underlying loan occurs, it is not proper for the bank, upon default of the buyer, to return the merchandise to the original maker. Thus, had there been an assumption, Beers' agreement to return the equipment to F & A would have been improper. He also stated there was nothing in the bank's file to show F & A ever requested to be released from the notes.

Mary Alice Warrington, who was president of FCB at the time of this transaction, stated that the bank did not recommend an assumption. She explained that merely adding the names of the Wilsons to the existing notes did not constitute assumptions of those notes.

Based on Frazell's testimony, it is clear that F & A never explicitly made a suretyship agreement with the Wilsons. F & A did, however, expect to be sureties and were willing to agree to that arrangement. While Bobby Wilson stated that he understood there was an assumption, he said nothing about what the Wilsons intended.

F & A received no money or property from the execution of the instrument by the Wilsons. They did, however, receive the benefit of having other parties liable on the note who were to pay the monthly payments.

Frazell testified that he believed the bank thought the Wilsons were creditworthy. He stated that had he known the Wilsons were considered a credit risk, F & A "would never have agreed to do the deal" and they would never have turned over the tractors to the Wilsons. Obviously, F & A did not leave their names on the notes for the sole purpose of helping the Wilsons obtain credit.

The bank's evidence showed that it considered the Wilsons a poor credit risk and would not extend credit to them. While Beers stated that the Wilsons "assumed the note," on the whole, his testimony, as well as the testimony of other bank personnel, does not support an assumption. Even if it did, there was no corresponding release of F & A or recognition of the Wilsons as the primary debtors. The bank continued to consider F & A primarily liable. The Wilsons merely became co-signers and assumed payments, but not the notes.

When the Wilsons stopped making payments the bank sent them a letter to inform them the bank had "accelerated the demand clause in the installment notes that [they] guaranteed for F & A Equipment Leasing." The letter went on to say that if the notes were not paid in full by August 28, 1986, the Wilsons were "to surrender your collateral that is pledged securing your loan." A copy of the letter was sent to F & A. F & A's argument that the bank acknowledged their suretyship status by sending this letter to the Wilsons fails because, as comakers, they would all be jointly and severally liable and FCB could expect payment from each and every one of the comakers, in no particular order. *Caldwell,* 567 S.W.2d at 280. Similarly, F & A's argument that their agreement with

5. *See* Tex.Bus. & Com.Code Ann. § 9.302 (Tex. UCC)   (Vernon 1991).

Beers that he would return the collateral to them if the Wilsons stopped paying does not prove suretyship status. As comakers, F & A are entitled to possession of the collateral. The fact that the Wilsons received the full benefit of the collateral does not prove suretyship status. *First Nat'l Bank v. Brown*, 172 S.W.2d 151, 154 (Tex. Civ.App.—Fort Worth 1943, writ ref'd w.o.m.). As comakers, F & A may choose to forego all benefits stemming from use and possession of the collateral. Further, they did receive the benefit of having additional parties liable on the notes whom the bank could look to for payment.

Considering only the evidence and inferences which support the trial court's finding that F & A were sureties and disregarding all evidence and inferences to the contrary, we conclude there is more than a scintilla of evidence to support the trial court's position. Since F & A believed themselves to be sureties and expected to remain on the notes, it could be inferred that they intended to be sureties. The trial court could have inferred that Bobby Wilson intended to assume the notes from his statement that it was his understanding that he and his brother did assume the notes. Beers, a bank representative, made statements consistent with the existence of an assumption of the notes and recognition of F & A as sureties. Beers stated that the bank would allow the Wilsons to assume the notes if F & A remained on the notes to secure them. He told F & A that the addition of the Wilsons' signatures on the notes was the same as having F & A sign as sureties. The trial court could have inferred from those statements that the bank agreed to the assumption and to look to F & A only as sureties, rather than principal obligors. Therefore, we conclude there is more than a scintilla of evidence to support the finding. *Kindred*, 650 S.W.2d at 63. Consequently, the trial court's implied finding of suretyship status survives the no evidence test.

However, we conclude that the trial court's implied finding does not survive the factual sufficiency challenge. Considering all of the evidence, as we are required to do in a factual sufficiency challenge, the evidence shows: F & A did not lend their names for the sole purpose of helping the Wilsons obtain credit; F & A did receive a direct benefit from the transaction; FCB did not accept an assumption of the notes; FCB did not consent to F & A's change from principal to surety; and FCB never released F & A from liability as principals on the notes. Therefore, the trial court's implied finding that F & A were sureties on the notes is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. Further, as there was no determination of the extent to which F & A has a right of recourse against the Wilsons, and thus no determination of the extent to which F & A can be discharged from liability as comakers, F & A have not shown entitlement to discharge from joint and several liability. Thus, it was error for the trial court to find, as a matter of law, that F & A should prevail on its defense of collateral impairment, because the evidence is insufficient to support that legal theory. *Simpson*, 727 S.W.2d at 664. Consequently, we sustain point five. We reverse the trial court's judgment discharging F & A's obligation on the notes and remand that portion of the cause to the trial court.

■ In its fourth point of error, FDIC asserts that the trial court erred in failing to submit a jury question on whether F & A were consumers with regard to the services performed by FCB in connection with the transfer of the collateral to the Wilsons and, thus, had standing to bring suit under the Deceptive Trade Practices Act (DTPA). *See* Tex.Bus. & Com.Code Ann. § 17.50(a) (Vernon 1987). F & A claim FCB failed to preserve this point of error because it did not make a proper objection at trial and did not submit a substantially correct question as required by rule 278. *See* Tex.R.Civ.P. 278.

■ An objection to a jury charge must clearly designate the error and explain the grounds of complaint. *Snyder v. Byrne*, 770 S.W.2d 65, 69 (Tex.App.—Corpus Christi 1989, no writ). FCB made the fol-

lowing objections relevant to the question of F & A's consumer status:

[Counsel]: Your Honor, the Plaintiff, First Consolidated Bank, objects to the failure of a jury issue on whether the credit check was an incident to F & A's attempt to purchase or lease services or product.

Our contention is that the credit check was run by the bank in connection with the purchase or acquisition of the equipment by the Wilsons, making the Wilsons a consumer and not F & A.

First Consolidated objects to the absence of a jury issue on whether the credit report given by Mr. Beers to F & A was incident to F & A's purchase or a lease of the service or a loan for the same reason.

Consumer status is an element necessary to be proved by F & A in asserting its DTPA claim against FCB. *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980). Rule 278 requires only an objection to the trial court's failure to submit a question on which FCB did not have the burden of proof. FCB was not required to submit the omitted question in substantially correct form. TEX.R.CIV.P. 278. We conclude that FCB's objections were sufficient to apprise the trial court of its complaint. FCB contended that the credit check and resulting report, the services rendered in connection with the transfer of the collateral to the Wilsons, were not incident to the loans made to F & A. Further, while F & A were consumers to the notes, they were not consumers to these services. We conclude FCB's objection preserved the point of error.

■ The trial court submitted to the jury a question under the DTPA asking if FCB engaged in false, misleading or deceptive acts. To submit this issue, the trial court had to conclude, as a matter of law, that F & A enjoyed consumer status with regard to the services performed by FCB in connection with the transfer of the collateral to the Wilsons. Ordinarily, the question of whether a party is a consumer under the DTPA is one of law to be determined by the trial court. *Ridco, Inc. v. Sexton*, 623

S.W.2d 792, 795 (Tex.Civ.App.—Fort Worth 1981, no writ). However, if some of the basic components of the question of consumer status are in dispute, those questions should be submitted to the jury. *Id.* Next, we must look to the evidence before the trial court to determine whether the trial court properly found consumer status as a matter of law. *Id.*

■ Two requirements must be established for a person to qualify as a consumer under the DTPA: (1) the person must have sought or acquired goods or services by purchase or lease; and (2) the goods or services purchased or leased must form the basis of the complaint. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981). Certainly, F & A are consumers with regard to the original loans from FCB because they used the loan money to purchase goods—the lost collateral. *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 566 (Tex.1984). The question is whether F & A are consumers with regard to the services provided by FCB in connection with the transfer of the collateral to the Wilsons. "Services" includes an activity on behalf of one party by another. *Riverside Nat'l Bank*, 603 S.W.2d at 174.

The record reveals that FCB and F & A had a continuing relationship with regard to the notes. FCB occasionally gave advice to F & A concerning F & A's business. It is undisputed that F & A requested FCB investigate the Wilsons' credit-worthiness and that FCB did. FCB was asked to advise F & A of its findings. FCB admitted knowing that the outcome of the credit check was important to F & A's decision to make a deal with the Wilsons. FCB admitted investigating the Wilsons and discussing the matter with F & A. According to FCB, a new loan was never made. It simply added the Wilsons as comakers of the original notes. Further, an FCB representative testified that the Wilsons were never FCB's customers. We conclude that any services provided in connection with adding the Wilsons to the notes and transferring the collateral from F & A to the Wilsons were necessarily provided in connection with the original loans in which F & A were

consumers. The services made the basis of F & A's DTPA claim were merely collateral to the original loans and were additional objectives of the same transaction. Consequently, F & A's consumer status continued with regard to these services. *Juarez v. Bank of Austin*, 659 S.W.2d 139, 142 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Fortner v. Fannin Bank*, 634 S.W.2d 74, 76 (Tex.App.—Austin 1982, no writ). Therefore, the trial court did not err in finding F & A consumers as a matter of law, and was not required to submit the matter to the jury. We overrule point four.

In its sixth point of error, FDIC contends the trial court erred in awarding attorney's fees to F & A. FDIC assumes that the award of attorney's fees was based on the jury finding that FCB committed gross negligence and argues that attorney's fees are not recoverable for gross negligence as a separate item, but only as an element of exemplary damages. F & A assert they are entitled to attorney's fees under section 38.001 of the Civil Practice and Remedies Code and under section 17.50 of the DTPA.

The record shows that the issue of attorney's fees was reserved for a separate hearing before the trial court subsequent to the jury's verdict. We do not have before us a statement of facts for that hearing. In the judgment, the trial court ordered that F & A recover $37,975 for attorney's fees for services rendered through the date of the judgment and additional sums for appeals. The judgment does not recite upon which ground attorney's fees were awarded. No findings of fact or conclusions of law on the issue of attorney's fees were filed. Therefore, we must affirm the trial court's award of attorney's fees if it can be upheld on any legal theory that finds support in the evidence. *Ex parte Aiken*, 766 S.W.2d 580, 582 (Tex. App.—Dallas 1989, no writ).

The judgment includes a finding by the trial court that FCB breached a contractual agreement with F & A. FDIC has not attacked the trial court's finding of breach. Section 38.001 of the Civil Practice and Remedies Code provides that a person may recover attorney's fees if the claim is for an oral or written contract. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1986). In addition, the jury found that FCB engaged in false, misleading, or deceptive acts. FDIC has not attacked that jury finding and has not prevailed on its complaint that F & A was not a consumer. Thus, F & A would be entitled to attorney's fees in their successful DTPA suit. TEX. BUS. & COM.CODE ANN. § 17.50(d) (Vernon 1987). Since F & A would be entitled to attorney's fees under both of these provisions, the trial court did not err in awarding attorney's fees to F & A. We overrule point six.

Due to our disposition of point five, we need not reach points one, two, three, seven or eight. As points nine through twelve have been adversely decided against FDIC by the Supreme Court of Texas, we need not address those points. Therefore, we reverse the trial court's judgment discharging F & A's obligation on the notes and remand that portion of the cause to the trial court. The judgment is affirmed in all other respects.