Appellees= Motion for Rehearing En Banc Granted; Opinion of March 27,
2007 Withdrawn; Affirmed and Majority, Concurring, and Dissenting Opinions on
En Banc Rehearing filed July 15, 2008








 

Appellees= Motion for Rehearing En Banc Granted; Opinion of
March 27, 2007 Withdrawn; Affirmed and Majority, Concurring, and Dissenting
Opinions on En Banc Rehearing filed July 15, 2008.               

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00407-CV

____________

 

CHRISTOPHER GREEN, Appellant

 

V.

 

DWAINIA ALFORD, INDIVIDUALLY AND AS NEXT FRIEND OF
AARON ALFORD, AND RONALD ALFORD, Appellees

 



 

On Appeal from the 152nd District Court

Harris County, Texas

Trial Court Cause No. 2002-53991

 



 

M A J O R
I T Y    O P I N I O N   O N   E N   B A N C   R E H E A R I N G

We grant
Ronald and Dwainia Alford=s motions for rehearing en banc, withdraw our opinion and
judgment of March 27, 2007, and issue the following majority opinion on en banc
rehearing and accompanying judgment in its place. 








This
case arises from a traffic accident in which a fire truck collided with another
vehicle, causing Ronald Alford to sustain a broken neck and causing permanent
neurological damage to his nine-year-old son, Aaron.  The trial court found
that Christopher Green, the firefighter driving the truck, acted recklessly and
was not entitled to official immunity or limitation of liability.  Green asks
us to reverse the judgment against him, arguing that there is legally and
factually insufficient evidence that he acted recklessly and that his actions
were not performed in good faith.  In the alternative, he raises a matter of
first impression, arguing that damages are statutorily limited to $100,000
because he is insured by a policy purchased by the City of Pasadena, despite
the fact that coverage is subject to a $100,000 self-insured retention.  We
conclude that (a) Green failed to establish he was acting in good faith at
the time of the accident, (b) legally and factually sufficient evidence
supports the trial court=s finding that Green acted recklessly, and (c) the
damage cap set forth in section 108.002 of the Civil Practice and Remedies Code
does not apply to these facts.  We therefore affirm the trial court=s judgment.

I.  Factual and Procedural Background

A.        Uncontested Facts  








At
approximately 5:15 p.m. on August 30, 2002, Christopher Green, a volunteer
firefighter for the Pasadena Volunteer Fire Department, received notice that an
automatic fire alarm had been activated.  He arrived at the fire station in
fewer than five minutes and waited for additional firefighters to arrive before
responding to the alarm.  Green and the other firefighters then departed on
Engine 81, an eight-person fire truck, which, including the firefighters,
weighed 39,500 pounds.  In the intersection of Jana Lane and westbound Fairmont
Parkway, the fire truck collided with a pickup truck occupied by three members
of the Alford family.  The collision propelled the pickup truck diagonally across
the intersection where it crashed into the utility pole supporting the traffic
lights.  Dwainia Alford suffered comparatively minor injuries, but Ronald
sustained a broken cervical vertebrae.  Nine-year-old Aaron was the most
severely injured; he remained in a coma for twelve days and suffered severe neurological
trauma from his head injuries.

On October 18, 2002, Dwainia Alford, acting in her
individual capacity and as Aaron=s next friend,
sued Green for damages stemming from the accident.  Ronald Alford intervened. 
Following a nonjury trial, the trial court entered judgment against Green for
an amount in excess of $1.5 million.  The trial court made specific findings of
fact and conclusions of law holding that Green engaged in reckless conduct and
was not entitled to official immunity because he was not acting in good faith
at the time of the accident.  The trial court=s ruling was based
on the contested evidence summarized below.

B.        Fact Witnesses  

1.         Appellees Ronald and Dwainia
Alford, Pickup Truck

Ronald
Alford testified that immediately before the accident, he was driving in the
northernmost lane of westbound Fairmont Parkway with his wife and son.  He
stated that his radio was off, and the traffic light facing him at Jana was
red, but it turned green as he slowed to approach the intersection.  According
to Alford, he looked to his right and left, saw that the cross-traffic was
stopping, and entered the intersection at approximately 30 miles per hour.  He
stated that he Ajust caught a flash of [the fire truck] out
of . . . the corner of [his] eye@ before the fire truck struck his
vehicle in the middle of the driver=s side.   Dwainia Alford testified
that traffic to the left of the pickup obscured her vision, but she never heard
a siren or horn before the impact.

2.         Appellant
Christopher Green and Richard Lawhorn, Fire Truck 








Green
testified that he activated the fire truck=s emergency lights and siren before
he left the fire station, and as he turned north on Jana, he began to
periodically sound his horn.  Volunteer firefighter Richard Lawhorn, who was
riding in the front passenger seat beside Green, similarly testified that the
fire truck=s lights and siren were on.  Green stated that he drove at no more than
30 miles per hour,[1] and as he
neared the intersection of the westbound lanes of Fairmont Parkway, the traffic
light facing him was red.  Green testified that he slowed and looked to his
right, saw that traffic in the first two lanes was stationary, and saw no
traffic in the third lane.   Lawhorn testified that he, Lawhorn, could not see
the third lane of Fairmont due to the heavy traffic, which was backed up nearly
to the next intersection. Lawhorn leaned forward to put on his jacket[2]
while Green entered the intersection at a speed that Lawhorn estimated to be no
more than 20 to 25 miles per hour.  According to Green, AAfter I saw that there was two lanes
of traffic stopped, didn=t see the third and started to proceed through that - - that
lane those three lanes and had the accident.@  Green further stated that his speed
was no more than 10 miles per hour.

Although
Green testified that he drove slowly enough to stop before hitting any vehicle
he observed entering the intersection, he also stated that he did not know how
to calculate braking distances and would defer to the Alfords= expert, Richard Schlueter, on that
subject.[3]  Green
further agreed that other drivers truthfully testified that he could not react
quickly enough to avoid the accident at the speed he was traveling, and the
fire truck=s speed made it Aimpossible to stop.@ 








Green
did not see the Alfords= pickup before the impact.  He did not recall if there were
trucks in the first two lanes that could have impaired his view of the far lane
but testified that he could not rule out that possibility.  He also did not
know if Lawhorn blocked his view while putting on a jacket.  Green agreed,
however, that if a firefighter Acould not see the third lane of traffic,@ the correct approach would be Ato stop before proceeding through the
intersection.@  According to Lawhorn, Green should have known there was Aa substantial certainty@ that if a smaller vehicle collided
with Engine 81, there was Aa high degree of risk of serious injury.@  

3.         Bystanders    

Nine
other drivers or bystanders testified at trial.  Most of these fact witnesses
testified that the fire truck=s emergency lights were on, and none testified that the
emergency lights were off.  One witness could not recall if she heard a siren,
and the remaining eight were evenly divided as to whether the siren was
activated.  Four witnesses also testified that Green sounded his horn, but
several others denied hearing a horn.  Invoices for repairs to the fire truck
indicate that its air horns were replaced after the accident. 

Several
of these witnesses also estimated Green=s speed just before the accident. 
Josef Wells stated that he did not see the fire truck brake as it entered the
intersection at 20 to 30 miles per hour.  Glenn Daley also testified that he
did not see the fire truck slow down or see its brake lights activate, and he
estimated the fire truck=s speed at 30 miles per hour.  Douglas Lowther estimated the
fire truck=s speed at 25 to 30 miles per hour, and James Vaught placed its speed at
no more than 30 miles per hour.  According to Victor Lucero, the truck Azoomed right through@ the intersection at 40 to50 miles
per hour.  Jamie Faulkner did not estimate the fire truck=s speed, but testified that it
approached  Avery fast@ and did not slow or stop before entering the intersection.








C.        Expert
Witnesses

1.         Dr.
Mark Mayo, Bayshore Eye Associates

Since 1995, Dr. Mark Mayo has treated Green for keratoconus,
a progressive eye disease that weakens the cornea and causes it to develop
irregular curvatures.  Such curvatures can cause blurring and decreased
distance vision and affect a person=s ability to drive.  When Green first
became a patient, his keratoconus was between mild and moderate in severity,
and his vision was correctable with glasses Ato a fairly high level.@  In 1997, however, Green reported
that he had failed a vision test necessary for a driver=s license, and Green=s lens prescription was changed.

In November 2001, nine months before the accident, Green
complained to Mayo of decreased distance vision.  Tests showed that Green=s vision had worsened, and medical
records indicate that Green Adid not want contact lenses because of his job as a
firefighter.@  According to Mayo, Aany activity in which [Green] was looking into the distance
would be affected without correction.@  Although Green=s visual acuity was becoming
progressively worse, Mayo stated that at the time of the accident, Green=s Avisual acuity with glasses was
sufficient to drive an automobile.@  Within four months of the accident,
however, Green=s vision was so poor he had difficulty watching television. 

2.         Jerry
Gardner, Chief of the City of Pasadena Fire Department

Chief
Gardner testified that firefighters must comply with state law and local
ordinances, and he would not authorize a violation of state law.  Gardner
agreed that it would be a violation of state law, city ordinance, and
department policy to drive a fire truck though a red light without the sirens
activated.  Moreover, Gardner agreed that doing so would be reckless.  Although
there are recordings of radio transmissions from Engine 81, Gardner testified
that no siren can be heard on these recordings. 








 Gardner
stated it was his understanding that Green did not come to a complete stop
before entering the intersection of Jana Lane and westbound Fairmont Parkway. 
He further agreed that, according to Green=s statement at the scene, A[Green] had slowed down for westbound
Fairmont.  It appeared that two of the three lanes were yielding.  So, [Green]
was going to move on forward and continue northbound onto
Jana . . . .@  According to Gardner, a firefighter
who cannot see one lane should stop before proceeding into the intersection;
however, Gardner also testified that if a firefighter cannot see one lane , he
should A[p]roceed with due regard[,]@ which means slowly enough to stop if
necessary.  As Gardner stated, AI guess creeping with your foot on the brake would be slow
enough to stop.@ 

Although
Gardner is the chief of the fire department where Green volunteered, Gardner
did not know that Green had keratoconus and did not Ahave any recollection of [Green]
wearing glasses.@  Moreover, Gardner agreed that A[n]o reasonable fire operator [sic]
could believe that driving a fire truck in responding to a call without his
glasses or corrective lenses as required by his driver=s license would be reasonable when
other drivers [are] available to drive.@  

3.         Richard Schlueter, P.E.,
Accident Reconstruction Expert








Accident
reconstruction expert Richard Schlueter testified that Green was driving at
approximately 23 miles per hour at the time of impact, and the Alfords were
traveling at approximately 25B30 miles per hour.[4]  He further
testified that Green could not have slowed to 10 miles per hour as he
approached westbound Fairmont Parkway, because the fire truck could not have
accelerated from 10 to 23 miles per hour in the short distance between the
beginning of the intersection and the location of the impact.  According to
Schlueter, if a fire truck driver detected a hazard while driving at 10 miles
per hour, the fire truck would travel 20 to 21 feet before it could be brought
to a stop; at 25 miles per hour, the braking distance increased to 75 feet.  At
the intersection where the accident occurred, each of the three lanes is 11
feet wide, and the total width of the intersection is only 33 feet.[5] 
Schlueter also performed calculations regarding lines of sight and concluded
that if Green had stopped anywhere within the area of the two inside turn lanes
on Jana, he could have seen the third lane of westbound Fairmont.  

4.         Robert Neal Stage,
Director of Training, EMS Division, National Academy of Professional Drivers

Robert
Stage testified that, in his opinion, Green caused the accident because he
failed to secure the third lane of traffic before driving the fire truck into
that lane.  According to Stage, Green should have known that his actions posed
a high degree of risk of serious injury.[6] 
Stage further explained that the Aextreme high degree of risk@ of serious injury is increased
during rush hour and when driving against traffic signals.  The weight of the
fire truck also increases the risk, and obscured views Adramatically increase[] the high
degree of risk of injury.@ 








Stage
also testified that automatic fire alarms do not convey the nature of the
emergency, but they rarely signal a life-threatening situation.[7] 
Here, Green was responding to an automatic alarm less than half a mile from the
fire station; he had to pass through two traffic lights to reach that
destination, and it would have taken A[p]robably no more than 15 seconds@ to proceed Awith due regard [to] the public
safety[.]@  Stage further testified that even a firefighter responding to a
life-threatening situation is required to secure all lanes of traffic and make
sure that traffic had yielded the right of way before proceeding into a lane. 
Balancing the risks posed by failing to follow this procedure versus the need
to respond rapidly, the firefighter must secure the lanes, because failure to
do so can result in the firefighting team=s failure to arrive at the emergency
at all.   In addition, firefighters and the public could be injured.[8]  
According to Stage, the risk of harm Ashould have been most definitely
clear to [Green]@ and his actions were reckless, regardless of whether his
sirens were activated.

D.        Trial
Court Rulings

Shortly
before trial, the parties filed cross-motions for summary judgment on the
application of official immunity and the statutory damages cap.  The trial
court granted summary judgment in the Alfords= favor on those issues, and Green
responded by filing a motion for reconsideration on the day the nonjury trial
began.  All parties presented evidence on these issues.  At the close of
evidence, Green moved for judgment as a matter of law on the basis of official
immunity.  The trial court denied the motion but stated that it would consider
Green=s evidence on the issue of official
immunity.[9]  








As the
trier of fact, the trial court resolved the conflicting accounts of the
accident. After weighing all the evidence, the trial court found, inter alia,
that (1) Green was not wearing corrective lenses as required at the time
of the accident; (2) he entered the intersection against the traffic light;
(3) due to traffic in the southernmost and middle lanes of westbound
Fairmont Parkway, Green=s view of the northernmost lane was impaired; (4) at the
time of impact, the fire truck was traveling at 23 miles per hour; (5) the
fire truck entered the intersection at a speed too fast to stop for westbound
traffic that might be entering the intersection; (6) at the time of the
collision, Green was not using the fire truck=s siren or other audible warning
signal; (7) Green did not act in good faith, and (8) Green=s conduct was reckless.

The trial
court awarded damages to the Alfords in an amount exceeding $1.5 million.  This
appeal timely ensued.

II.  Issues Presented

In three
issues, Green contends the trial court erred in (1) denying his motion for
judgment as a matter of law on the basis of official immunity,
(2) rendering judgment based on legally and factually insufficient
evidence of recklessness and causation, and (3) rendering judgment for
damages exceeding the limit of liability set forth in Section 108.002 of the
Civil Practice and Remedies Code.[10]

III.  Analysis

A.        Official
Immunity

1.         Purpose








Official
immunity under common law is based on the necessity for public servants Ato act in the public interest with
confidence and without the hesitation that could arise from having their
judgment continually questioned by extended litigation.@  Ballantyne v. Champion Builders,
Inc., 144 S.W.3d 417, 424 (Tex. 2004).  It is an affirmative defense
barring state law claims against a governmental employee=s performance (1) of discretionary
duties, (2) within the scope of the employee=s authority, (3) provided that the
employee acts in good faith.  Id. at 422; Univ. of Houston v. Clark,
38 S.W.3d 578, 580B81 (Tex. 2000); City of Lancaster v. Chambers, 883
S.W.2d 650, 653 (Tex. 1994).  The doctrine rests on the theory that the threat
of liability will make public officials unduly timid in carrying out their
official duties, and effective government will be promoted if officials are
freed of the costs of vexatious and often frivolous litigation.  Westfall v.
Erwin, 484 U.S. 292, 295, 108 S. Ct. 580, 583, 98 L. Ed. 2d 619 (1988), superseded
by statute on other grounds, 28 U.S.C. '' 2671B2679 (1989 Supp.), as recognized
in United States v. Smith, 499 U.S. 160 (1991).  Thus, immunity from state
law claims is intended to insulate essential governmental functions from the
harassment of litigation and remove the deterrent to public service posed by
the threat of heavy personal liability for errors in judgment.  See
Ballantyne, 144 S.W.3d at 424; Kassen v. Hatley, 887 S.W.2d 4, 8
(Tex. 1994).  

Here, the parties do not dispute that
two of the three requirements for official immunity are satisfied.  They agree
that Green was performing a discretionary duty within the scope of his
authority.  The only requirement for official immunity in dispute is the
existence of good faith.                                             

2.         Good Faith 








To determine whether a public
official has acted in good faith, we look to the objective standard adopted in City
of Lancaster v. Chambers.  883 S.W.2d at 656.  We examine the record to
determine whether a reasonably prudent official, under the same or similar
circumstances, could have believed that his conduct was justified based on the
information he possessed when the conduct occurred.  Wadewitz v. Montgomery,
951 S.W.2d 464, 467 (Tex. 1997).  In making this determination, Aconsideration of subjective evidence
of the good faith element of official immunity is inappropriate.@  Ballantyne, 144 S.W.3d at
419.  

This test is intended to balance
competing concerns.  On one hand, Athe court must consider the rights of
bystanders or other innocent parties if [a public official] acts in gross
disregard of public safety.@  Chambers, 883 S.W.2d at 656.  On the other hand, the
test is designed to reduce the deterrent effect that the threat of liability
may pose to a public official=s willingness to act Awith the decisiveness and the
judgment required by the public good[,]@ as well as the injustice of imposing
personal liability on a public official whose duties require him to exercise
discretion.  Id.  

The tension between these concerns is
especially clear in instances of Aemergency response@ driving.  The rapid response
required of law enforcement personnel, paramedics, and firefighters is
essential for the effective performance of their duties, but the same actions
also can pose serious risks to motorists, bystanders, and the responding
officials themselves.  Consequently, claims arising from an official=s high-speed or Aemergency@ driving are subject to a
particularized need/risk analysis.  Telthorster v. Tennell, 92 S.W.3d
457, 464 (Tex. 2002) (A[T]he particularized need/risk factors were crafted in an
attempt to tailor a test that would better weigh the risks that high-speed
chases and responses pose to the general public.@).  

3.         Need/Risk Analysis








Where Aemergency response@ driving is concerned, the urgency of
the Aneed@ for the official=s conduct is measured by factors such
as (a) the seriousness of the emergency to which the official is
responding; (b) whether the official=s immediate presence is necessary to
prevent injury or loss of life; and (c) what alternative courses of
action, if any, are available to achieve a comparable result.  Wadewitz,
951 S.W.2d at 467.  ARisk@ is measured by countervailing public safety concerns such as
(a) the nature and severity of harm the official=s actions could cause, including
injuries to bystanders and the possibility that an accident would prevent the
official from reaching the scene of the emergency; (b) the likelihood that
any harm would occur; and (c) whether any risk of harm would be clear to a
reasonably prudent official.  Id.  Because the information known to the
official may change rapidly, leaving little time for deliberation, high-speed
emergency responses Arequire a continuing assessment of need and risk.@  Clark, 38 S.W.3d at 582B83; see also Wadewitz, 951
S.W.2d at 467; Chambers, 883 S.W.2d at 656B57.  If the public official considers
multiple courses of action and selects one that a reasonable official could
believe to be justified by the information possessed at the time, the duty of
good faith is satisfied as a matter of law.  See Ballantyne, 144 S.W.3d
at 426.

4.         Sufficiency of the Evidence of Good Faith

In support of his contention that he
is entitled to a finding of good faith as a matter of law, Green first argues
that courts have repeatedly A[m]aintain[ed] the high burden required to defeat immunity@ and have held officials immune as a
matter of law in cases similar to this.  He then asserts that he conclusively
established his good faith.  Finally, he argues that the Alfords failed to
raise a genuine and material fact issue concerning good faith.  

We do not find these arguments
persuasive.  As discussed below, Green=s arguments ignore unfavorable
evidence, and the cases on which he relies are readily distinguishable. 
Finally, Green=s arguments are based on erroneous conceptions of the evidence to be
considered and the standard by which it is reviewed.

a.         Evidence
to be Considered








Green=s arguments begin with the faulty
assumption that in analyzing the evidence of good faith, we should consider
only conduct that has been found to cause the accident.  For example, he
contends we should disregard Gardner=s adverse expert testimony that no
firefighter could believe it was reasonable to drive the fire truck without
required corrective lenses if other firefighters were available to drive
because the Apurported failure to wear glasses played no part in the accident.@  Green cites no evidence or finding
of fact to support this assertion and identifies no authority that would allow
us to imply such a finding.[11]  

Further, this argument is contrary to
precedent.  If evidence refuting good faith pertains to the official=s performance of a discretionary duty
within the scope of his authority, neither the trial court nor the reviewing
court is required to disregard that evidence simply because the official=s additional misconduct actually
caused the harm alleged.  See Chambers, 883 S.W.2d at 655B56 (stating that government officials
are entitled to official immunity from suit arising from the performance of
their discretionary duties in good faith as long as they are acting within the
scope of their authority).  Instead, courts simply measure good faith against a
standard of objective legal reasonableness.  Id. at 656.  An officer seeking
to overturn a trial court=s finding that he failed to act in good faith must address
all evidence in the record material to the good faith determination.  See City of Keller v. Wilson,
168 S.W.3d 802, 825B26 (Tex. 2005); Harris County v. Smyly,
130 S.W.3d 330, 334 (Tex. App.CHouston [14th Dist.] 2004, no pet.).[12]  


 

b.         Standard of Review

In his brief, Green initially recites
the standard of review correctly, but his arguments rely on the application of
other standards to the facts.  For example, he states, 








To create a genuine issue of material
fact . . . on good faith, the non-movant must do more than
show that a reasonably prudent officer could have decided against taking the
action in question.  The non-movant must show Ano reasonable person in the officer=s
position could have thought that the facts justified the officer=s acts.@

. . .

In sum, and in light of Texas
authority discussed above, the Alfords= evidence falls well short of that
required to raise a fact question on good faith.

Although these statements incorporate
requirements applicable to a summary-judgment respondent, they apply only if
the summary-judgment movant has first produced evidence  establishing good
faith.  If the movant has failed to do so, the burden to produce controverting
evidence to raise a genuine issue of material fact does not shift to the respondent.[13] 
      








Here, the Alfords do not begin with
the burden to disprove good faith.  As previously noted, official immunity is
an affirmative defense; thus, Green bore the burden at trial to prove all of
its elements.  See Ballantyne, 144 S.W.3d at 424; Kassen, 887
S.W.2d at 8B9; Chambers, 883 S.W.2d at 653.  We review the trial court=s denial of Green=s motion for judgment as a matter of
law based on the legal sufficiency of the evidence, crediting evidence favoring
the verdict if a reasonable factfinder could, and disregarding contrary
evidence unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller, 168
S.W.3d at 825B26.  To establish good faith as a matter of law after the factfinder has
resolved conflicting evidence in favor of the claimants, an official appealing
the denial of official immunity must prove that, based on the facts and
reasonable inferences favoring the claimants, a reasonable officer
performing a need/risk assessment using that information could have believed
the official=s conduct to be justified.  See Smyly, 130 S.W.3d at 334; cf.
Scott v. Harris, BU.S.B, 127 S. Ct. 1769, 1774B75 (2007) (stating that, when
reviewing ruling on official=s motion for summary judgment claiming qualified immunity,
the court usually adopts the plaintiff=s version of the facts).  

In addition, an appellant challenging
the sufficiency of the evidence offered in a nonjury trial must challenge
specific findings of fact.  Zagorski v. Zagorski, 116 S.W.3d 309, 319
(Tex. App.CHouston [14th Dist.] 2003, pet. denied).  We defer to a trial court=s factual findings if they are
supported by the evidence.  Perry Homes v. Cull, BS.W.3dB, No. 05-0882, 2008 WL 1922978, at *9
(Tex. May 2, 2008).  And as a reviewing court, we are bound by any unchallenged
findings of fact unless the contrary is established as a matter of law or the
finding is not supported by any evidence.  McGalliard v. Kuhlmann, 722
S.W.2d 694, 696 (Tex. 1986).  Thus, we will reverse the trial court=s denial of Green=s motion only if the evidence
conclusively proves facts establishing his entitlement to official immunity as
a matter of law.  See Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex.
2001) (a party attacking the legal sufficiency of an adverse finding on an
issue on  which he bore the burden of proof must demonstrate that the evidence
establishes, as a matter of law, all vital facts in support of the issue).  If
sufficient evidence was presented at trial such that Areasonable minds could differ@ regarding the facts on which the
claim of immunity is based, then the trial court did not err in denying a
motion for judgment as a matter of law.  See Kassen, 887 S.W.2d at 9.

(i)      No Conclusive Proof of
Good Faith








According to
Green, some of the trial court=s factual findings are supported by
legally and factually insufficient evidence, and thus, do not support a finding
of recklessness.  In particular, he challenges the findings that he failed to
wear glasses, activate the siren, and slow Aas necessary for
safe operation@ before entering the intersection.  He also contests
the finding that he had actual awareness that his conduct posed a high degree
of risk of serious injury.  He does not contend, however, that disregarding
these findings, as we are required to do if they are unsupported, undermines
the trial court=s finding that Green failed to act in good
faith.  And even if we completely disregard the challenged findings, the trial
court=s judgment
concerning Green=s lack of good faith is supported by the
unchallenged findings and the evidence.  

Here, the trial
court made the following findings of fact relevant to Green=s information
concerning the Aneed@ portion of the
need/risk analysis, including the seriousness of the emergency, the need for
his immediate presence to prevent injury or loss of life, and the alternative
courses of action available to achieve a comparable result:

$                  
Green was
responding to an automatic fire alarm, and the overwhelming majority of
automatic fire alarms are false alarms or do not require the immediate presence
of a firefighter;[14] 


$                  
Slowing or
stopping at the intersection would have reduced his response time by 15B30 seconds;[15]
and

$                  
Other
firefighters were available to drive.

 

These unchallenged
findings are supported by the record.   

The trial court
also made the following findings of fact relevant to a reasonable firefighter=s assessment of
risk in light of the information available to Green at the time of the
collision:

$                  
Green has
suffered from keratoconus, a progressive eye disease, since at least 1995;








$                  
In about 1997,
Green reported to his eye specialist that he failed a vision test conducted by
the Department of Public Safety;

$                  
Approximately
ten months before the collision, Green reported to his eye specialist that he experienced
decreased distance vision and blurring, and he refused a special contact lens
prescription due to his job as a firefighter;[16]

$                  
On December 9,
2002, Green reported to his eye specialist that there were changes in his
visual acuity; he had blurring of his vision, and difficulty watching
television;

$                  
Green never
reported any problems with his vision to the Pasadena Volunteer Fire
Department;

$                  
A restriction
on Green=s driver=s license requires him to wear
corrective lenses;

$                  
At the time of the accident, Green
was not wearing corrective lenses when driving the fire truck;[17]

$                  
Other fire
fighters were available to drive the truck;

$                  
When Green
entered the intersection of Fairmont and Jana, it was evening rush hour on the
Friday beginning Labor Day weekend;

$                  
Green had
actual knowledge that traffic would be heavy at this intersection;

$                  
The speed limit
on Fairmont Parkway was 45 miles per hour;

$                  
When Green
entered the intersection, the traffic light facing him was red;

$                  
The traffic
light facing westbound Fairmont was green;

$                  
The fire truck
weighed 39,500 pounds;

$                  
Trucks in the
southernmost and middle lanes of westbound Fairmont Parkway impaired Green=s view of the northernmost lane of
traffic;

$                  
Prior to the collision, Green did
not see the northernmost lane of westbound Fairmont Parkway;

$                  
Driving into
this lane without determining whether the vehicles in that lane had yielded to
the fire truck posed a high degree of risk of serious injury;

$                  
Green was
traveling too fast to stop for any traffic in the northernmost lane of
westbound Fairmont Parkway; 








$                  
He drove the
fire truck into the northernmost lane of westbound Fairmont Parkway at 23 miles
per hour;

$                  
Green would
have been delayed by 15B30 seconds by stopping or slowing
as necessary to ascertain that all traffic had yielded; 

$                  
Green was aware
of the high degree of risk of serious injury posed by entering the intersection
against a red light without first ascertaining that all lanes of cross-traffic
had yielded to the presence of the fire truck;

$                  
He did not
assess and reassess the risk posed by his conduct and the need for his presence
at the scene of the alarm; 

$                  
When
Green approached the intersection of Jana Lane and westbound Fairmont Parkway,
he did not identify and consider the viability of alternative courses of action
to achieve a comparable result.

These findings are
supported by the testimony summarized in Section I of this opinion.  

The trial court
also heard expert evidence of the objective standard of reasonableness
applicable to these facts.  Jerry Gardner, Chief of the City of Pasadena Fire
Department, categorically agreed that if other drivers were available, no
reasonable fire truck operator could believe it would be reasonable to respond
to an alarm by driving a fire truck without wearing corrective lenses required
by a restriction on the firefighter=s driver=s license.  This
testimony was uncontroverted.  And although Gardner ultimately opined that
Green acted in good faith, he admitted that he reached that conclusion by
assuming the truth of disputed factsCincluding the
assumption that, if required to do so, Green was wearing corrective lenses at
the time of the accidentCand by failing to consider other
uncontroverted facts, such as the higher speed limit on Fairmont relative to
Jana.  Cf. City of Keller, 168 S.W.3d at 813  (reviewing court Acannot consider
only an expert=s bare opinion, but must also consider contrary
evidence@). 








Considering, under
the appropriate standard of review, the evidence of Green=s conduct and the
circumstances concerning risk and need as the evidence indicates he perceived
them, and applying the objective standard of reasonableness, we conclude that
Green failed to conclusively establish his good faith.  Cf. Telthorster,
92 S.W.3d at 463 (A[O]fficial immunity is designed to protect
public officials from being forced to defend their decisions that were reasonable
when made, but upon which hindsight has cast a negative light.@ (emphasis
added)).  To the contrary, the evidence is sufficient to support the conclusion
that no reasonable fire truck operator could have believed that the need
justified the risks Green chose to take.  

c.       Green=s Legal
Authorities

In support of his argument that the evidence is legally
insufficient to support the finding that he did not act in good faith, Green
analogizes this case to three other cases.  As discussed below, however, these
authorities are readily distinguishable.

In City of San
Angelo Fire Department v. Hudson, the Third Court of Appeals reversed and
rendered judgment recognizing a firefighter=s claim of
official immunity.  179
S.W.3d 695, 706B07 (Tex. App.CAustin 2005, no pet.).  Unlike the case before us, the
firefighter in Hudson offered uncontroverted summary-judgment evidence
that a reasonable firefighter could have believed the conduct at issue was
justified under the circumstances.  Id. at 704B06.  Here, however, even the Aconduct at issue@ is a matter of dispute.  See
Chambers, 883 S.W.2d at 656B57 (questions of material fact concerning good faith preclude
summary judgment).  Green contends that he wore his glasses, used the fire
truck=s horn and siren, checked all three
lanes on westbound Fairmont, and proceeded at no more than 10 miles per hour. 
But there is conflicting evidence that Green did not wear his glasses, did not
use the fire truck=s horn or siren, did not see the northernmost lane of westbound
Fairmont, and entered that lane blindly traveling at 23 miles per hour.   The
trial court found the latter evidence more credible, and Green presented no
evidence that a reasonable firefighter could have believed such conduct was
justified. 








To avoid the need to address this
evidence, Green appears to suggest that, because the factfinder considers the
official=s perception of circumstances when
analyzing good faith, the official=s testimony regarding those
perceptions must be accepted as true, and contrary evidence disregarded.  This
suggestion is not only contrary to the standard of review on appeal, but it
disregards the factfinder=s role in resolving conflicts in the evidence based on the
credibility of the witnesses.  See McGalliard, 722 S.W.2d at 697.

Johnson v. Campbell, another summary judgment case, is
also distinguishable.  In Johnson, a police officer responding to a
family violence call drove into an intersection against a red light and
collided with another vehicle.  Johnson, 142 S.W.3d 592, 594B95 (Tex. App.CTexarkana 2004, pet. denied).  The
officer offered uncontroverted evidence that a reasonably prudent officer under
the same or similar circumstances could have believed the course of action was
reasonable because the need to respond outweighed any clear risk of harm to the
public.  Id. at 595.  Although the plaintiff in Johnson offered
evidence that the officer behaved recklessly, the reviewing court held that A[r]ecklessness is negligence, and
negligence is immaterial when determining if an officer acted in good faith.@  Id. at 596. 

We do not agree that negligence and
recklessness are synonymous, nor do we agree with the Johnson court=s implication that evidence of
recklessness is immaterial to a determination of good faith.  Moreover, Johnson
is distinguishable on the facts; unlike here, it appears that the plaintiff
in Johnson offered no evidence controverting the officer=s assertion that a reasonable officer
could have believed his conduct was justified.  Here, however, Green=s own expert agreed that no
reasonable fire fighter could have believed it was reasonable to drive the fire
truck without required corrective lenses if other firefighters were available.[18]








Green also relies on Rivas v. City
of Houston, in which we affirmed the trial court=s rendition of judgment
notwithstanding the verdict.  17 S.W.3d 23, 29 (Tex. App.CHouston [14th Dist.] 2000) (op. on
reh=g); 19 S.W.3d 901 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied) (supp. op. on second mot. for reh=g).  In that case, paramedics were
transporting a patient who became increasingly combative, loosened his
restraints, and fell off a gurney in the ambulance.  17 S.W.3d at 26.  The
defendant driver stopped the ambulance repeatedly to allow paramedics to
restrain the patient.  Id.  The  transport was upgraded to emergency
status, and while crossing an intersection against a red light, the ambulance
collided with the plaintiff=s truck.  Id.  There was no evidence that the
ambulance=s siren was activated, and conflicting evidence regarding whether its
emergency lights were on.  Id.  We concluded that the driver established
his good faith as a matter of law.  Id. at 28B29.

Significantly, however, the standard
of good faith applied in Rivas differed from that announced in Chambers
and further explained in Wadewitz.  Instead, the jury in Rivas was
instructed without objection as follows:

[The defendant ambulance driver]
acted in Agood faith@ if a reasonably prudent ambulance driver, under the same or
similar circumstances, could have believed that the need to immediately take
the patient to the hospital outweighed a clear risk of harm to the public in
proceeding past a red or stop signal without slowing down as may be necessary
for safe operation. 

Id. at 27 (emphasis added).  Because the appellant in Rivas
did not object to this definition of Agood faith,@ the legal sufficiency of the
evidence was measured against the standard recited in the jury charge.  See
Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (A[I]t is the court=s charge, not some other unidentified
law, that measures the sufficiency of the evidence when the opposing party
fails to object to the charge.@).  

By instructing the jury to consider
only certain matters in determining good faith, the trial court in Rivas restricted
the factors to be balanced in the need/risk assessment.[19] 
Significantly, the jury was not required to consider the driver=s awareness of the risks posed by
failure to use a siren or emergency lights.  Consequently, the jury was guided
away from consideration of all the factors comprising Athe same or similar circumstances.@  








Here, however, we are not presented
with a jury charge that omits factors relevant to the need/risk analysis.  This
was a nonjury trial, and the trial court could consider all relevant facts in
deciding Awhether a reasonably prudent official, under the same or similar
circumstances, could have believed that his conduct was justified based on
the information he possessed when the conduct occurred.@  Ballantyne, 144 S.W.3d at
426 (emphasis added); cf. Clark, 38 S.W.3d at 579 (holding that the Wadewitz
factors apply to good faith determinations in police pursuit cases).  And
in reviewing the trial court=s judgment, we likewise consider all of the evidence, indulge
every reasonable inference that would support the verdict, and disregard
contrary evidence unless a reasonable fact-finder could not. City of Keller,
168 S.W.3d at 827.  Consequently, Rivas does not guide our review of
this case.

Because the evidence is legally
sufficient to establish that Green was not operating the fire truck in good
faith at the time of the accident, we conclude the trial court did not err in
denying Green=s motion for judgment as a matter of law.  We therefore overrule Green=s first issue.

B.        Recklessness








In his
second issue, Green contends the evidence is legally and factually insufficient
to support four specific factual findings in connection with the trial court=s conclusion that his conduct was
reckless.  In the alternative, he argues that the findings do not support the
conclusion that he was reckless.  The trial court=s finding of recklessness is
significant because under section 546.005 of the Transportation Code, the
driver of an emergency vehicle is not relieved from Athe duty to operate the vehicle with
appropriate regard for the safety of all persons@ or Athe consequences of reckless
disregard for the safety of others.@  Tex.
Transp. Code Ann. ' 546.005 (Vernon 1999).  This provision Aimposes a duty to drive with
due regard for others by avoiding negligent behavior, but it only imposes liability
for reckless conduct.@  City of Amarillo v. Martin, 971 S.W.2d 426, 431
(Tex. 1998) (interpreting predecessor provision).[20]   1.         Standard
of Review

In a nonjury trial, findings of fact
have the same force and dignity as a jury=s verdict.  Dallas County
Constable Precinct No. 5 v. Garden City Boxing Club, Inc., 219 S.W.3d 613,
615B16 (Tex. App.CDallas 2007, no pet.).  When a
complete reporter=s record is filed, we review the trial court=s findings of fact for legal and
factual sufficiency under the same standards we apply to jury verdicts.  See
Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam).  In doing so,
we do not substitute our judgment for that of the factfinder, even if we would
have reached a different conclusion when reviewing the evidence.  FDIC v.
F&A Equip. Leasing, 854 S.W.2d 681, 684B85 (Tex. App.CDallas 1993, no writ). 

We review the evidence for legal
sufficiency under the previously-described standard set forth in City of
Keller.  In addition, a party challenging the factual sufficiency of a
finding on which that party bore the burden of proof at trial must demonstrate
that the adverse finding is against the great weight and preponderance of the
evidence.  Dow Chem., 46 S.W.3d at 242.  In reviewing a factual
sufficiency challenge, we consider and weigh all the evidence in a neutral
light and may set aside the finding only if the evidence is so weak or the
finding is so against the great weight and preponderance of the evidence that
it is clearly wrong and unjust.  Id. 

2.         Sufficiency
of the Evidence to Support Factual Findings

To prevail against the driver of an
emergency vehicle, a claimant must show that the driver committed acts or
omissions that the driver knew or should have known posed a high degree of risk
of serious injury.  Martin, 971 S.W.2d at 430.  This test is designed to
address concerns that








the possibility of incurring civil
liability for what amounts to a mere failure of judgment could deter emergency
personnel from acting decisively and taking calculated risks in order to save
life or property or to apprehend miscreants.  The Areckless disregard@ test, which requires a showing of
more than a momentary judgment lapse, is better suited to the legislative goal
of encouraging emergency personnel to act swiftly and resolutely while at the
same time protecting the public=s safety to the extent practicable.

Id. (quoting Saarinen v. Kerr, 644 N.E.2d 988, 992
(N.Y. 1994)).

In connection with his challenge to
the recklessness finding, Green disputes the following adverse findings of the
trial court:

22.       Defendant Christopher Green was not wearing
corrective lenses when driving the fire truck at the time of the collision.

26.       Defendant Christopher Green did not slow the
speed of the fire truck as necessary for safe operation before he entered the
intersection in which the collision occurred.

27.       Driving a fire truck weighing 39,500 pounds
into an intersection with heavy cross traffic, such as the traffic on westbound
Fairmont Parkway during evening rush hour, against a red light governing the
fire truck=s direction of travel, at a speed of approximately 23
miles per hour, without being able to first see that all of the lanes of cross
traffic had yielded to the fire truck poses a high degree of risk of serious
injury; prior to the collision, defendant Christopher Green had actual
awareness that such action posed a high degree of risk of serious injury.

52.       At
the time of the collision the operator of the fire truck was not using the fire
truck=s siren or other audible warning
signal.








In addition, Green argues that the
trial court did not expressly tie the challenged findings to the issue of
recklessness or specify which factual findings supported the conclusion that he
was reckless.  But, Green cites no authority for the proposition that the trial
court is required to include such statements in its findings of fact and
conclusions of law.  See Tex. R.
Civ. P. 298, 299 (addressing additional, amended, and omitted
findings).  The trial court is required to make additional findings of fact or
conclusions of law only if requested, and only if the requested material
relates to an ultimate or controlling issue rather than an evidentiary matter. 
See Rafferty v. Finstad, 903 S.W.2d 374, 376 (Tex. App.CHouston [1st Dist.] 1995, writ
denied).  Green does not contend that these conditions are satisfied here. 
Thus, we presume the trial court found omitted, unrequested findings consistent
with its judgment if other elements of the same ground of defense or recovery
are included in the trial court=s findings and the presumed findings are supported by the
evidence.  Tex. R. Civ. P. 299;  Black
v. Dallas County Child Welfare Unit, 835 S.W.2d 626, 630 n.10 (Tex. 1992); In
re K.R.P., 80 S.W.3d 669, 673 (Tex. App.CHouston [1st Dist.] 2002, pet.
denied).  

a.         Failure
to Wear Corrective Lenses

Green asserts that Finding No. 22 is
not supported by legally and factually sufficient evidence, but this argument
cannot be sustained.  Although Green testified that he was wearing glasses at
the time of the accident, this testimony was refuted by other evidence.
Lawhorn, who was seated beside Green at the time of the accident, testified
that he has known Green since 1998 or 1999 and has never seen him wear glasses
(other than safety glasses).  According to Lawhorn, Green was not wearing
glasses on this occasion.  Gardner offered similar testimony.  Green identified
himself in photographs taken at the scene, and he was not wearing glasses in
the photographs.  Despite Green=s testimony to the contrary, we conclude the evidence is
legally and factually sufficient to support the trial court=s finding that Green was not wearing
corrective lenses at the time of the accident. 








Green next argues that this factual
finding does not support the trial court=s conclusion that he was reckless. 
In support of this argument, he relies on Kolster v. City of El Paso[21]
for the proposition that the failure of an emergency-vehicle driver to wear
required corrective lenses shows only negligence.  But in Kolster, the
jury was asked only if an ambulance driver=s failure to wear glasses was
negligent;[22] thus,
negligence was the only standard applied.  See Osterberg, 12 S.W.3d at
55 (holding that when there is no objection to a defective jury charge, the
sufficiency of the evidence must be measured against the charge).  Because the
City of El Paso failed to preserve error regarding the submission of a simple
negligence standard rather than the recklessness standard, the issue of
recklessness was not addressed.  Kolster, 972 S.W.2d at 59.

Green also points to his doctor=s testimony that keratoconus did not
contribute to his failure to see the Alfords= vehicle.  But when making this
statement, Dr. Mayo was asked to assume that Green was wearing glasses.  AAnd if an expert=s opinion is based on certain
assumptions about the facts, we cannot disregard evidence showing those
assumptions were unfounded.@  City of Keller, 168 S.W.3d at 813.  

In addition, Green relies on Mayo=s statement that keratoconus Adoes not keep or disturb peripheral
vision from seeing large objects . . . . So, I do not believe his keratoconus
would have kept him from seeing a vehicle coming perpendicular.@  This statement does not affect our
analysis.  First, both Green and Lawhorn testified that Green looked to his
right, in the direction of the northernmost westbound lane of Fairmont
Parkway.  The factfinder can infer that by turning his head to face the lane,
Green moved the image of the lane from the peripheral portion of his field of
vision to the central, blurred portion of his visual field.  Moreover, Green=s ability to detect large objects
using his peripheral vision would not necessarily help him to avoid collisions
with large objects directly in front of him, as happened here.   








In any event, Green=s argument that his failure to wear
corrective lenses is not evidence of recklessness is without merit.  Although
driving a fire truck through an intersection against a red light in rush hour
traffic on a holiday weekend requires the rapid, accurate, and continual
assessment and reassessment of the relative locations of the other vehicles on
both streets, Green not only undertook this exercise without slowing as
necessary for safe operation, but chose not to wear the lenses required to
correct his blurred and decreased distance vision.  According to the facts as
found by the trial court, he did so despite the fact that other firefighters
were available to drive.  He then entered the northernmost westbound lane of Fairmont
at a speed that did not enable him to stop before striking any cross-traffic
that might be in the lane, and did so despite the fact that he did not see that
lane.[23] On these
facts, together with testimony of Green and Stage acknowledging the high degree
of risk of serious injury, a reasonable factfinder could conclude that Green
knew or should have known that his conduct exposed himself, his fellow
firefighters, and the general public to a high degree of risk of serious
injury. 

Considering the totality of the
evidence, we do not find Green=s arguments persuasive.  Green acknowledged that there was a
high degree of risk of serious injury if the fire truck collided with a smaller
vehicle.  The trial court found that Green=s conduct proximately caused the
Alfords= injuries and found that Green=s conduct was reckless.  The trial
court was neither requested nor required to list all evidence supporting the
causation finding and did not do so. 

b.         Failure to Slow for Safe Operation

Green argues that Finding No. 26 is
contradictory to his testimony and to the testimony of firefighter Lawhorn and
southbound driver Vaught, each of whom testified that Green slowed before
entering the intersection.  Green further argues that because three other
witnesses testified only that they did not see the fire truck=s brake lights, their testimony is
not probative of whether or not he actually slowed the fire truck.  We
disagree.








Evidence is Aprobative@ if it logically tends to make a
particular proposition of consequence to an issue at trial either more or less
likely.  Boswell v. Brazos Elec. Power Co‑op., Inc., 910 S.W.2d
593, 601 n.3 (Tex. App.CFort Worth 1995, writ denied).  And with certain exceptions
inapplicable here, vehicles operated on Texas roads must be equipped with at
least one brake light mounted on the rear of the vehicle that emits a red or
amber light visible in normal sunlight for at least 300 feet when the vehicle=s brakes are applied.  Tex. Transp. Code Ann. ' 547.323 (Vernon 1999).  Testimony
that a witness did not see illuminated brake lights on a moving vehicle is some
indication that the driver was not applying the brakes at that time.  

On the other hand, even
uncontroverted evidence that Green applied the fire truck=s brakes is not conclusive evidence
that he slowed Aas necessary for safe operation.@  Cf. id. ' 546.001(2) (authorizing an emergency
vehicle operator to proceed past a red traffic signal or stop sign Aafter slowing as necessary for safe
operation@).  The trial court could have found that Green applied the brakes before
entering the intersection but was traveling at such a high rate of speed that
he could not slow Aas necessary for safe operation.@  This inference is supported by the
testimony of Schlueter and Stage, among others.

Because there is more than a
scintilla of evidence that Green failed to slow Aas necessary@ before entering the intersection, the
evidence is legally sufficient to support the trial court=s finding.  In addition, the finding
is not contradicted by the great weight and preponderance of the evidence.  We
therefore conclude that the evidence supporting the finding is factually
sufficient.  We further determine that Green=s failure to slow to for safe
operation of the fire truck is another factor supporting the conclusion that
his conduct was reckless.  See City of Amarillo v. Pruett, 44 S.W.3d
702, 706 (Tex. App.CAmarillo 2001, pet. denied) (factfinder could consider
officer=s speed and traffic conditions in
determining recklessness).

c.         Actual
Awareness of High Degree of Risk of Serious Injury

In Finding No. 27, the trial court
found that Green had actual awareness that driving the fire truck at 23 miles
per hour into an intersection with heavy cross-traffic against a red light without
being able to first see that all of the lanes of traffic had yielded posed a
high degree of risk of serious injury.  Although Green contends that the
evidence supporting this finding is legally and factually insufficient, he does
not specifically challenge any of the facts recited in this finding.  Instead,
he contends that his failure to secure the northernmost lane of westbound
Fairmont was not reckless.








In support of this argument, Green
states that Aemergency vehicle operators are entitled to proceed against red lights
even though some risk exists.@  Here, however, we are not concerned
with conduct that posed Asome risk,@ but with conduct that Green knew or should have known posed
a Ahigh degree of risk of serious
injury.@  That is the applicable test for recklessness
under Texas law.  Martin, 971 S.W.2d at 430B31.[24]








Under the same heading, Green argues
that, in reviewing the evidence of recklessness, we are barred from considering
the testimony of Robert Stage.  According to Green, Stage=s testimony is of no probative force
because Stage holds Green to an improper legal standard in that he testified
that a firefighter is required to secure all lanes of cross-traffic.  Again, we
disagree.  Stage testified that Green should have known that failure to secure
all lanes of cross-traffic posed a high degree of risk of serious injury.  This
uncontroverted testimony addresses the correct legal standard for recklessness
under Texas law.[25]  

Thus, the evidence is legally and
factually sufficient to support the conclusion that Green should have known of
the high degree of risk of serious injury posed by crossing this intersection
against the light during rush hour of a holiday weekend without securing a lane
of traffic that crossed the intersection at 45 miles per hour. 

d.         Failure to Use a Siren








In arguing that the evidence is
insufficient to support the finding that he failed to use a siren, Green points
out that firefighter Lawhorn and four other bystanders agree with his own
testimony that the fire truck=s siren was activated.  Nevertheless, the Alfords and four
other witnesses did not hear a siren, and although a witness might fail to hear
a siren for a variety of reasons, such failure nevertheless is some evidence
that there was no siren to be heard.  See City of El Paso v. Higginbotham,
993 S.W.2d 819, 825B26 (Tex. App.CEl Paso 1999, no pet.) (holding that witnesses= testimony that they heard no siren
defeats summary judgment regarding ambulance driver=s good faith because there was no
evidence that the driver could have believed that running a red light without
using the siren was justified).  In addition, Chief Gardner testified that
there is a recording of the radio transmissions from the fire truck, and that
if a firefighter is transmitting while the siren is on, the siren can be heard
on the radio transmission; however, he admits that no siren can be heard on the
radio transmissions made from Engine 81.  Although Green contends that the
failure of some witnesses to hear the siren is not probative of whether the
siren was activated, this argument does not explain why the sound of a siren
failed to register on a recorded transmission.  

We conclude that, viewed in the light
most favorable to the trial court=s finding, the evidence is sufficient
to allow reasonable people to disagree about Green=s use or non-use of the siren; thus,
the evidence is legally sufficient to support the finding.  Moreover, viewed in
a neutral light, the finding is not against the great weight and preponderance
of the evidence.  We therefore conclude that the evidence also is factually
sufficient to support the  trial court=s finding.

Green next contends that the failure
to use a siren when entering an intersection against the light does not support
a finding of recklessness.  In support of this argument, he relies on Smith
v. Janda, 126 S.W.3d 543 (Tex. App.CSan Antonio 2003, no pet.).  In Smith,
the Fourth Court of Appeals held as a matter of law that an ambulance driver
who approached an intersection with the vehicle=s lights and sirens activated and
slowed before the intersection was not reckless.  Id. at 546.  The court
reasoned that A>an emergency vehicle operator responding to an
emergency call is allowed to proceed against a red traffic light after
slowing for safe operation.=@ Id. (emphasis added) (quoting
Flores v. City of San Antonio, No. 04-99-00555-CV, 2000 WL 767871, at *4
(Tex. App.CSan Antonio  June 14, 2000, pet. denied) (not designated for
publication)); see also Flores, 2000 WL 767871, at *4 (A[E]mergency vehicle operators are
insulated under Chapter 546 from conduct short of recklessness, for proceeding
through a red light after slowing for safe operation with audible or visual
signals activated.@ (emphasis added) (citing Hale v. Pena, 991 S.W.2d
942, 946B47 (Tex. App.CFort Worth 1999, no pet.))).  Here,
however, the factfinder concluded that Green did not slow as necessary for safe
operation before entering the intersection.  Thus, Smith is inapposite.








Green further argues that he was
entitled to presume that other vehicles would yield to the fire truck.  In
support of this argument, he relies on the following language from the Texas
Supreme Court=s decision in Martin: AIt is unfortunate that some civilian
drivers are less than vigilant in abiding by their duties to keep a lookout for
and to yield to emergency vehicles, but emergency vehicle operators are
entitled to presume that other drivers will respect emergency priorities.@[26]  Martin, 971 S.W.2d at 432. 
But the court further reasoned that Acivilian drivers generally have an
advantage when it comes to anticipating and preventing a collision.  Under most
circumstances, the lights, sirens, and distinctive coloring of an emergency
vehicle make it stand out from the others . . . .@  Id.    

Unlike the circumstances described in
Martin, Alford=s view was blocked, and under the facts as found by the trial
court, Green chose not to use a siren.  Consequently, it was Green rather than
Alford who had Aan advantage in anticipating and preventing a collision.@  Under the facts as found by the
trial court, Green knew that a green light faced the heavy cross-traffic; that
traffic could cross his path at 45 miles per hour; and that his vision was
blurred and his distance vision was decreased.  He had the option to wear his
glasses, allow someone else to drive, use the siren, or slow down or stop
before entering the lane.  The Alfords, on the other hand, had no reason to
expect that Green was about to drive into their lane against the light at a
speed that would not allow him to stop before colliding with anything else in
the intersection.  We therefore conclude that under the record and the
supported findings of fact, Green=s failure to use a siren is a factor
supporting the conclusion that Green=s behavior was reckless.  

In sum, we conclude legally and
factually sufficient evidence supports the challenged findings.  Further, these
findings support the trial court=s conclusion that Green=s conduct was reckless.  Accordingly,
we overrule Green=s second issue.

C.        Limitation of Liability








In his final issue, Green raises an
issue of first impression: is a public servant Acovered@ by insurance Afor [an] amount not in excess of
$100,000@ if the insurance policy is subject
to a $100,000 self-insured retention?  Specifically, Green challenges the trial
court=s refusal to apply the damages cap
set forth in section 108.002(a)(2)(C) of the Texas Civil Practice and Remedies
Code, which provides:

[A] public servant is not
personally liable for damages in excess of $100,000 arising from personal
injury . . . if the damages are the result of an act or
omission by the public servant in the course and scope of the public servant=s . . . service
on behalf of a . . . local government; and for the amount
not in excess of $100,000, the public servant is covered by liability or errors
and omissions insurance . . . .  

Tex. Civ.
Prac. & Rem. Code Ann. ' 108.002(a)(2)(C) (Vernon 2005)
(emphasis added).  Green contends that because he is an assured under a
liability and errors and omission insurance policy issued to the City of
Pasadena, section 108.002 caps his liability as a matter 

of law.








The construction of a statute is a
question of law, which we review de novo.  F.F.P. Operating Partners, L.P.
v. Duenez, 237 S.W.3d 680, 683 (Tex. 2007).  If an insurance policy
provision has only one reasonable interpretation, it is unambiguous, and we
must construe it as a matter of law.  Fiess v. State Farm Lloyds, 202
S.W.3d 744, 746 (Tex. 2006).  As used in section 108.002, a Apublic servant@ includes a volunteer of a local
government.[27]  There is no
dispute that Green=s work as a volunteer firefighter for the City of Pasadena is
encompassed within this definition.  The parties also agree that the City of
Pasadena is the named insured on a liability and errors and omissions policy,
and the policy defines the term Aassured@ to include the City=s volunteers while acting within the
scope of their duties.  In addition, the parties agree that the City=s insurance policy is unambiguous and
can be construed as a matter of law.  They also do not dispute that the
accident occurred while Green was acting within the scope of his duties.[28] 
Finally, it is undisputed that the City=s insurance policy is subject to a
$100,000 self-insured retention (ASIR@).  The parties disagree, however, on
how section 108.002 applies to these facts.

1.         Interpretations
Presented

The Alfords argue that, regardless of
whether coverage was potentially available for amounts in excess of $100,000,
Green was not Acovered@ Afor the amount not in excess of
$100,000@ because coverage is subject to a
$100,000 SIR, and (a) Aself-insurance is not insurance@; (b) as an assured, Green is responsible
for paying the $100,000 SIR, and he therefore derives no benefit from the SIR
requirement; (c) the policy imposes no obligation on the City to pay the
SIR on Green=s behalf; and (d) the Alfords= automobile insurer agreed that the
SIR is an Auninsured gap in coverage.@ 

The trial court concluded that
section 108.002 did not apply to Green for two reasons.  First, A[a]t the time of the collision, for
the amount not in excess of $100,000.00, defendant Christopher Green was not
covered by liability or errors and omissions insurance; he was only covered
under the City of Pasadena policy for the amount above $100,000.00 to
$1,000,000.00.@  Second, Aunder '102.002(c)(2) of the Texas Civil Practice[] and Remedies
Code, the City of Pasadena is not authorized to indemnify defendant Christopher
Green, pursuant to '108.002(a)(2)(B) of the Texas Civil Practice[] and Remedies Code,
because defendant Christopher Green=s conduct constituted gross
negligence.@  Section 102.002(c)(2) of the Civil Practice and Remedies Code provides
that, with certain exceptions inapplicable here, Aa local government may not pay
damages awarded against an employee that arise from a cause of action involving
a wilful or wrongful act or omission or an act or omission constituting gross
negligence.@  Id. ' 102.002(c)(2).








Green does not challenge the trial
court=s conclusion that, by statute, the
City is not authorized to indemnify him.  Nevertheless, he contends that
because he is an Aassured@ and the accident was an Aoccurrence@ or Awrongful act,@ coverage for him was triggered under
the policy.  He asserts that he Ahas a contractual right of indemnity
under the policy such that the City must provide the first $100,000 of
indemnity before the insurance company must provide the remainder up to the
policy limit.@  Thus, Green urges us to construe both the statutes and the policy de
novo, conclude that the policy affords him $100,000 of coverage, and render
judgment that he is entitled to statutory limitation of liability as a matter
of law.

2.         Comparison
of Section 108.002(a)(2)(C) and the Policy

Under the terms of the section
108.002(a)(2)(C), the liability of a public servant for personal injury damages
is limited to $100,000 if Afor the amount not in excess of $100,000, the public servant
is covered by liability or errors and omissions insurance . . . .@  Our inquiry does not focus on
whether some accidents Amay be@ covered or whether the actor is insured for amounts exceeding
$100,000.  See Brooks v. Northglen Ass=n, 141 S.W.3d 158, 169 (Tex. 2004) (AWhen construing a statute, the Court
must presume that every word of the legislation has meaning.@).  Rather, to satisfy the terms of
the statute, the first $100,000 of personal injury damagesCi.e., the amount Anot in excess@ of $100,000Cmust be Acovered@ under a liability or errors and
omissions policy.

The policy=s terms, however, describe its
coverage as Aexcess@ insurance above a $100,000 self-insured retention.  The SIR is defined
as Athat dollar amount specified in the
Schedule of Self[-]Insured Retentions which the Assured is obligated to pay
because of loss or damage covered under any Section of this policy, before
this policy indemnifies the Assured for the same loss.@ (emphasis added).[29] 
The carrier Ais liable only for the Ultimate Net Loss in excess of the applicable
Self[-]Insured Retention, and not more than the Excess Limit of Insurance.@[30]  The carrier has no duty to defend.








The policy requires the Aassured@ to pay the $100,000 SIR, and as a
volunteer, Green is included in the definition of Aassured.@  Thus, Afor the amount not in excess of
$100,000,@ the policy does not shift the risk of defense costs, investigative
expenses, or adverse judgment from Green to the carrier or even to the City.  Cf.
Stewart Title Guar. Co. v. Cheatham, 764 S.W.2d 315, 318B19 (Tex. App.CTexarkana 1988, writ denied)
(explaining that an insurer Aassumes particular risks@ of the insured).[31] 
To the contrary, the requirement that an Aassured@ pay the SIR applies equally to both
Green and the City.  See 1 Allan
D. Windt, Ins. Claims & Disputes ' 11.31, at 348B50 (3d ed. 1995) (A[P]roperly viewed, a self-insured
retention does not constitute insurance . . . . [but
instead] represents the amount of the loss that the insured is responsible for
before the coverage is triggered.@); see also Hertz Corp. v.
Robineau, 6 S.W.3d 332, 335 (Tex. App.CAustin 1999, no pet.) (Under Texas
law, Aself-insurance is not >other insurance.=@). 

In sum, Green contends, AIf the City pays the first $100,000,
Green is covered.@  But section 108.002 is concerned only with that Afirst $100,000.@  See Tex. Civ. Prac. & Rem. Code Ann.  ' 108.002(a)(2)(C) (liability is
limited if the public servant is covered by liability insurance Afor the amount not in excess of
$100,000@ (emphasis added)).  Thus, coverage
in excess of $100,000 is not at issue.  








An additional problem with Green=s argument is manifested in his use
of the word Aif.@  This word denotes an uncertain possibility, not an obligation, and
Green failed to establish that anyone has an obligation to him to pay the first
$100,000 of damages assessed against him as a result of this claim.[32] 
This
uncertainty is magnified by the trial court=s finding that
Green was grossly negligent and the City of Pasadena therefore is not
authorized to pay damages awarded against him.  See id. ' 102.002(c)(2)
(providing that a local government may not pay damages arising from an act or
omission that constitutes gross negligence).  Green does not contest the
finding that he was grossly negligent or the trial court=s conclusion
regarding the application of section 102.002.  He cites no evidence or authority in support of the
contention that the City nevertheless has an obligation to Aprovide the first $100,000 of
indemnity@ as Green alleges.  He produced no evidence that he contracted with the
City to satisfy the SIR obligation necessary to trigger the carrier=s duty to indemnify, and the policy
itself does not define the obligations between assureds.   See Helmerich
& Payne Int=l Drilling Co. v. Swift Energy Co., 180 S.W.3d 635, 641B42 (Tex. App.CHouston [14th Dist.] 2005, no pet.)
(holding that the language of a comprehensive general liability policy imposed
no contractual obligation on the named assured to reimburse additional assured
for claims within the deductible amount).  Moreover, this argument cannot be
reconciled with the trial court=s uncontested conclusion that, by statute, the City is not
authorized to indemnify Green.  In sum, the policy does not require the insurer
to indemnify Green, and section 102.002 does not authorize the City to
indemnify him.








On this record, we conclude Green
failed to establish that he Ais covered@ by liability or errors and omissions insurance Afor the amount not in excess of
$100,000@ as those terms are used in section
108.002.  We therefore overrule Green=s third issue, and we do not reach
the broader question of whether a self-insured retention constitutes Ainsurance@ in a more general sense. 

IV. 
Conclusion

We hold that Green failed to
conclusively establish that he was acting in good faith at the time of the
accident.  We further determine that the evidence is legally and factually
sufficient to support the challenged findings and the judgment.  Finally, we
conclude that Green failed to establish, as a matter of law, that he is covered
by liability insurance for an amount not exceeding $100,000 as required by
section 108.002 of the Civil Practice and Remedies Code.  Having overruled each
of the three issues presented on appeal, we affirm the trial court=s judgment.

 

 

 

/s/        Eva M. Guzman

Justice

 

 

Judgment rendered and Majority, Concurring, and
Dissenting Opinions on En Banc Rehearing filed July 15, 2008. (Frost, J.,
Concurring; Hudson, J., Dissenting).

En Banc Court consists of Chief Justice Hedges,
Justices Yates, Anderson, Fowler, Frost, Seymore, Guzman, Brown, and Boyce, and
Senior Justice Hudson.*









[1]  The speed limit on Jana Lane was 30 miles per hour.





[2]  Regarding Lawhorn=s
actions in putting on a jacket, Green testified as follows:

Q:         And isn=t
it true that he was putting on his jacket at the very moment when the collision
was occurring?

A:         I believe so.  I don=t really know.

Q:         Now, that jacket, that he was putting on,
that didn=t block your vision to the east, did it?

A:         If he is up by the window, I guess maybe so.  I don=t know how he was or how he was doing it. 





[3]  Schlueter=s
testimony is summarized infra at 7B8. 





[4]  According the Schlueter, his calculations were based
on police measurements taken at the scene, photographs of the Alfords= truck, inspection of the fire truck and the accident
scene, crash test data from a pickup similar to the Alfords= truck, and the parties= stipulation that the fire truck and firefighters had a combined weight
of 39,500 pounds.  His calculations included a post-impact trajectory analysis,
a momentum analysis, a simulation of the collision, a roll trip analysis, a
pole interaction calculation, and visual comparison of the damaged vehicles.  





[5]  Gardner agreed that if the fire truck was traveling
at 23 miles per hour, then it could not stop within 22 feet.





[6]  Training materials in the Pasadena Fire Department=s library addressed actual stopping distance and
reaction time.  For example, a training videotape from that library cautions
firefighters to A[u]se all warning devices and come to a complete stop
at blind intersections or intersections where the apparatus has a stop sign or
light.@





[7]  Chief Gardner agreed that Green would have known
that most automatic alarms are false alarms.





[8]  According to Stage, traffic accidents while
responding or returning from an emergency constitute the second leading cause
of death among firefighters.





[9]  The trial court=s
final judgment and its findings of fact and conclusions of law indicate that,
although no separate order rescinds the interlocutory order granting partial
summary judgment, the final rulings were based on the evidence presented at
trial.  Similarly, in the portions of their post-judgment motions that address
Green=s defense of official immunity, the parties discuss
evidence presented at trial.  We therefore follow the lead of the parties and
the trial court and treat Green=s defense of
official immunity as a matter decided based on evidence presented at trial rather
than on summary-judgment evidence.





[10]  Act of May 9, 1995, 74th Leg., R.S., ch. 139, 1995
Tex. Gen. Laws 982, 983B84, amended by Act of June, 2003, 78th Leg.,
R.S., ch. 204, '' 11.01, 11.07, 2003 Tex. Gen. Laws 847,885, 886,
eff. Sept. 1, 2003; Act of May 28, 2003, 78th Leg., R.S., ch. 289, '' 1, 5, 2003 Tex. Gen. Laws 1258, 1258, 1259, eff.
Sept. 1, 2003 (current version at Tex.
Civ. Prac. & Rem. Code Ann. '
108.002 (Vernon 1997)).





[11]  Green=s argument also ignores the fact
that official immunity is an affirmative defense; thus, Green bore the burden
at trial to prove all of its elements.  See Ballantyne, 144 S.W.3d at
424; Kassen, 887 S.W.2d at 8B9; Chambers, 883 S.W.2d at 653.  And if a defendant
relying on an affirmative defense fails to carry his burden at trial, then the
factfinder need only refuse to make the requested finding.  See Sterner v.
Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).  Because the factfinder
is not required to make a contrary affirmative finding, there is no basis for a
requirement that the factfinder go still further and state reasons for such a
contrary affirmative finding.  Here, the trial court was neither requested nor
required to point out reasons that negated a finding of good faith, and did not
do so. 





[12]  See also Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994) (AArtificial divisions in the
sequence of events do not aid a court=s evaluation of objective reasonableness.@), cited with approval in Telthorster,
92 S.W.3d at 463.





[13]  To clarify the procedural posture of the case, we note that Green did
not appeal the trial court=s adverse summary-judgment ruling.  Cf. Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(5) (Vernon Supp. 2007)
(permitting appeal from an interlocutory order denying summary judgment based
on assertion of immunity by employee of the state or political subdivision of
the state).  Instead, Green appeals the trial court=s denial of his motion for judgment
as a matter of law. 





[14]  These particular facts are undisputed, and the trial
court heard conflicting testimony concerning the weight that a reasonable
firefighter would assign to these facts in performing a need/risk analysis. 
Chief Gardner testified that he expects Green to know that the great majority
of automatic alarms are false alarms, and in his expert opinion, this knowledge
should be a factor in a driver=s decision
concerning whether to stop when the driver=s
view of cross-traffic is blocked.  On the other hand, Gardner also testified
that he treats every alarm as a life-threatening emergency, and Stage testified
that the same procedure for securing a lane of traffic applies regardless of
whether the firefighter is responding to an automatic alarm or an event known
to be life-threatening.  On the facts presented, we reach the same result
regardless of whether the alarm is treated as a probable false alarm or the
signal of a life-threatening emergency.  Our recitation of the facts found by
the trial court is not intended to suggest that any specific finding was
essential to the trial court=s judgment, and
we do not suggest that first-responders should or should not treat an automatic
alarm as a life-threatening emergency.





[15]  It is undisputed that the intersections of Fairmont and
Jana contained the only traffic lights between the fire station and the site of
the alarm.





[16]  Green therefore was given a prescription for
glasses.





[17]  Operating a motor vehicle without corrective lenses
in violation of a driver=s license restriction is a misdemeanor criminal
offense.  See Tex. Transp. Code
Ann. ' 521.221(c) (Vernon Supp. 2007).





[18]  Because the judgment is supported by expert
testimony, we do not reach the dissent=s
discussion of whether expert testimony is required.





[19]  Under the charge as given, Aneed@ was measured by the need to take
the patient to the hospital immediately and did not require the jury to
consider the driver=s awareness of other available
courses of action.  Cf. Wadewitz, 951 S.W.2d at 467.  Similarly, Arisk@ considerations were restricted to the possible harm
to one category of people (the public) posed by the combination of two acts by
the driver (failure to stop and failure to slow sufficiently).  The jury was
not required to consider the driver=s awareness of the risks his actions posed to the patient
or other paramedics.  Cf. id. 





[20]  Although the dissent states that Chief Gardner=s testimony that Green proceeded with due regard Acomes close to creating a fact issue,@ due regard forms no part of the test for immunity or
liability.  Proof of due regard does not establish good faith, and proof of its
absence does not establish recklessness.  Thus, testimony concerning due regard
does not create a fact issue on either issue.





[21]  972 S.W.2d 58 (Tex. 1998).





[22]  Id. at 59.





[23]  In Finding No. 14, the trial court wrote, APrior to the collision, defendant Christopher Green
did not see the northernmost lane of westbound Fairmont Parkway.@  Although the trial court wrote in Finding No. 15
that Green=s view of that lane was impaired due to traffic, the
trial court did not specify the reason for the separate and additional finding
that Green Adid not see@
the lane.  





[24]  Green asserts that courts addressing circumstances
similar to those presented here have concluded the driver=s conduct was not reckless.  In support of this
contention, he first cites Badalamenti v. City of New York, No.
12648/01, 2005 WL 287390, at *2 (N.Y. Sup. Jan. 24, 2005).  According to Green,
this case is illuminating because the court determined that a police officer=s Afailure to come
to a full stop prior to entering the intersection with his vision partially
obscured does not, standing along [sic], render his conduct reckless, even
if . . . his turret lights and siren were not in use.@  

Badalamenti,
however, has been reversed: 

Here, the parties= evidentiary submissions indicate
that the defendant police officer did not stop at the stop sign which
controlled the intersection where the accident occurred, that his view of the
intersection was partially obstructed by a parked truck, and that he
accelerated his speed upon entering the intersection.  In addition, there are
disputed issues of fact as to whether the defendant police officer activated
the turret lights and siren on his vehicle before proceeding into the
intersection.  Under these circumstances, the defendants are not entitled to
judgment as a matter of law on the issue of whether the defendant police
officer was operating his vehicle in reckless disregard for others at the time
of the accident. 

817
N.Y.S.2d 134, 135 (N.Y. App. Div. 2006) (emphasis added).

Green further contends that ANew York=s
application of the recklessness test is particularly compelling, as Martin
relied expressly on New York authority in establishing the Texas standard.@  This argument is unpersuasive.  Although New York
and Texas courts both use similar terms, Texas measures recklessness
differently.  For example, Green relies in part on Salzano v. Korba, 745
N.Y.S.2d 56, 57 (N.Y. App. Div. 2002).  But the Salzano court explained
that, under New York law, liability for an officer=s performance of a discretionary duty is imposed only
for

Areckless disregard@
for the safety of others, which is defined as the conscious or intentional Adoing of an act of an unreasonable character in
disregard of a known or obvious risk so great as to make it highly probable that
harm would follow@ and done with conscious indifference to the outcome. 


Id.
(citations omitted).  This is not the standard in Texas.  Green similarly
relies on a Mississippi case, which, like the New York cases he cites, imposes
liability only for a different measure of Areckless
disregard@ of public safety.  See Kelley v. Grenada County,
859 So. 2d 1049, 1053 (Miss. App. 2003) (AOur
case law indicates >reckless disregard=
embraces willful or wanton conduct which requires knowingly and intentionally
doing a thing or wrongful act.@ (quoting Turner
v. City of Ruleville, 735 So. 2d 226, 229B30 (Miss. 1999)).  Further, none of the cases on which Green relies
present the combination of facts presented here, including Green=s failure to wear corrective lenses as he was required
by law to do when operating any motor vehicle.





[25]  Moreover, the trial court could have concluded that
Green was driving at a speed that posed a high degree of risk of serious injury
even without considering Stage=s testimony. 





[26]  Here, however, the trial court did not find that Ronald Alford was Aless than vigilant@ or failed to keep a proper
lookout.  To the contrary, the trial court found that ARonald Alford operated his vehicle
in a manner that a person of reasonable and ordinary prudence would have under
the same or similar circumstances,@ and Green does not challenge this finding.  





[27]  See id. '' 108.001(1)(B) (defining Apublic servant@ as a person covered by section
102.001 of the Civil Practice and Remedies Code), 102.001(1) (defining Aemployee@ to include a volunteer of a local
government).  





[28]  The carrier, however, is not a party to this suit,
and its position regarding coverage is not part of the record.





[29]  For readability, full capitalization has been
changed to initial capitalization.





[30]  AUltimate net
loss@ is defined to include: 

hospital,
medical and funeral charges and all sums paid as salaries; wages; compensation;
fees; expenses for doctors, nurses, and legal; premium on attachment, appeal or
similar bonds (but without any obligation on the part of the [insurer] to apply
for or furnish such bonds); expenses of lawyers and investigators and other
persons and for litigation, settlement, adjustment and investigation of claims
and suits which are paid as a consequence of any loss or damage covered
hereunder.





[31]  See also Chambi v. Regents of Univ. of Cal.,
95 Cal. App. 4th 822, 826, 116 Cal. Rptr. 2d 50, 53 (2002):

It is axiomatic that self-insurance is not insurance. 
An Aallegation of self-insurance, which is equivalent to
no insurance, is repugnant to the concept of insurance which fundamentally
involves the shifting to a third party, by contract, for a consideration, the
risk of loss as a result of an incident or event.@

(quoting Richardson v. GAB Bus. Servs., Inc.,
161 Cal. App. 3d 519, 523, 207 Cal. Rptr. 519, 521 (1984)); Physicans Ins.
Co. of Ohio v. Grandview Hosp. & Med. Ctr., 44 Ohio App.3d 157, 158,
542 N.E.2d 706, 707 (1988) (A[S]elf-insurance
is not insurance; it is the antithesis of insurance.  Insurance shifts the risk
of loss from an insured to an insurer. Self-insurance >is the retention of the risk of loss by the one upon
whom it is directly imposed by law or contract.=@).





[32]  As we have previously pointed out, the issue of
whether an insured has satisfied a self-insured retention presents a question
of fact.  Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 685B86 (Tex. App.CHouston
[14th Dist.] 2006, pet. denied).  Green cites no evidence that the City has
voluntarily paid or agreed to pay the SIR on his behalf, and the record does
not establish these facts; thus, we are not confronted with the question of
whether Green would be considered Acovered
by liability insurance@ under such circumstances. 





* 
Senior Justice J. Harvey Hudson sitting by assignment.